MATHER AND STRONG *against* BUSH.

MOTION to set aside the *fieri facias* issued in this cause, Citizens of the
on the ground that the defendant, on the 16th of *August,* same state,
1817, was duly discharged from all his debts, under the " Act entering into
for giving relief in cases of insolvency," passed *April* 12, stood as ma-
1813, (1 *N. R. L.* 460. sess. 36. ch. 98.) It appeared that king them in
the judgment in favour of the plaintiffs was entered up in the existing
*May,* 1817, on a contract made in *March,* 1816; and that laws of the
both the parties were, at the time of passing the act, and state, and as
ever since have been, citizens of this state. tacitly consen-
ting that the
Similar applications were made to the Court, in other contract shall
causes; and, also, to set aside executions issued, where the be governed,
or modified,
defendants had been discharged under the insolvent act of by such laws.
the 3d of *April,* 1811. Motions were also made in several Therefore, if,
other cases, for leave to issue writs of *scire facias,* to revive at the time of
judgments, (one of them above twenty years standing,) entering into a
where the defendants had been discharged, under the insol- contract, there
vent act of the 21st of *March,* 1788, (which was re-enacted is a law of a
on the revision of the laws, *April,* 1801,) on the petition of state which
*three-fourths* of their creditors. declares, that
if an insolvent
The counsel for the different parties were successively debtor, on pe-
tition of two-
thirds of his
creditors, shall
assign to them
all his proper-
ty, he shall be
discharged
from his debts,
it is not a law
impairing the
obligation of
the contract,
within the
meaning of the constitution of the *United States.*

And where an execution is issued against the property of such debtor, acquired by him subse-
quent to his discharge under such insolvent act, on a judgment obtained previous to his discharge,
it will be set aside, on motion.

NEW-YORK, heard; but to prevent repetition, the substance of the arguments are here stated.

May, 1819.

MATHER
v.
BUSH.

*Griffin,* and *D. B. Ogden,* for the defendant. The execution has been issued, in consequence of the recent decisions of the Supreme Court of the *United States,* in the case of *Sturges* v. *Crowninshield,* and of *M'Niell* v. *M'Millan;* [Here the counsel read a manuscript copy of the opinions of that Court, as delivered by Mr. Chief Justice *Marshall;*] by which, it is supposed, the *insolvent acts* of the several states are determined to be unconstitutional and void. °

An *insolvent act* has uniformly existed in this state, ever since it was an independent government;(*a*) and the constitutionality of such a law has never before been questioned. Lately, counsel, in argument, have suggested that doubts had been, elsewhere, entertained on the subject; but this Court would never listen to any such suggestion, nor allow the question to be discussed for a moment. The Court will not, therefore, especially when the rights of so many innocent and *bóna fide* purchasers are concerned, give to the

· (*a*) A general act for the relief of insolvent debtors, permitting the ·debtor, in conjunction with *three-fourths* of his creditors, to petition for his discharge from his debts, existed in the *colony* of *New-York,* from °1761 to 1770. And a similar act was passed by the state legislature, in *April,* 1784, which was, at various times, *amended;* and on the 21st of *March,* 1788, was passed the act commonly called the *three-fourth* act, which was revised the 3d of *April,* 1801, and continued in force until the act of the 3d of *April,* 1811, which granted relief to the insolvent debtor, *on his petition only.* This act, however, did not continue for a year, but was repealed by the act of the 14th of *February,* 1812, and the act of 1801 thereupon revived and continued in force until the last revision of the laws, when the act of the 3d of *April,* 1813, was passed, allowing an *insolvent* debtor, in conjunction with *two-thirds* of his creditors, to *petition* for his discharge. So that the *system* of insolvent laws, authorizing the discharge of insolvent debtors from their debts, on a *bona fide* surrender of all their property, has, except during what may be called the period of the revolution, from 1770, to 1784, continued in *New-York,* for near sixty years. (*Smith & Livingston's* ed. of *Laws,* vol. 2. p. 62. 216. *Van Schaick's* ed. of *Laws,* vol. 1. p. 348. 392. *Jones & Varick's* ed. of *Laws,* vol. 1. p. 131. *J. & V.* vol. 2. p. 375. 2 *Greenleaf's* ed. of *Laws,* 204. 1 *Kent & Rad.* ed. 428.)

judgment of the Supreme Court of the *United States* any NEW-YORK, greater extension or effect, than they are compelled to do May, 1819. by the authority of a decision of that Court, in the precise case before them.

The Supreme Court of the *United States* admit the distinction between a law impairing the obligation of a *contract*, and a law modifying the *remedy* for enforcing the contract; and that statutes of limitation refer to the *remedy*. The execution, in this case, is a remedy; and this Court, consistently with the opinion of the Supreme Court of the *United States*, may refuse to permit the plaintiffs to use it; but leave them, if they wish to test the validity of the defendant's discharge, to bring an action of debt on the judgment, in which the discharge may be pleaded, and the decision of this Court, on a demurrer to that plea, may be brought, by writ of error, before the Supreme Court of the *United States*; or if the plea should be overruled, the plaintiff might obtain another judgment, on which he might have execution, but not so as to affect the titles of *bona fide* purchasers of lands, acquired and sold by the defendant since his discharge. Setting aside the execution, therefore, will be no mark of disrespect to the Supreme Court of the *United States*, for the plaintiff still has his remedy by action; but if the execution is levied, and all the after-acquired property of the defendant sold, he, or those claiming under him, will be utterly remediless.

Again; the judgment in this case is not a *contract*. In *Bidelson* v. *Whytel*, (3 *Burr. Rep.* 1545. 1548.) Lord *Mansfield* said, that a judgment was not a contract, within the act of 3 *James* I. ch. 8. requiring bail in error, &c. and he advised with all the judges, who held, that the contract was extinguished by the judgment; and that " a judgment is no contract, nor can it be considered in the light of a contract, for *judicium redditur in invitum.*"

The Supreme Court of the *United States* say, that an act of the state legislature, authorizing the discharge of the *person* of the debtor, is not unconstitutional; because, they say, *imprisonment* of the debtor is no part of the contract, but the means only of enforcing its performance. By the law of this state, when the judgment was given, the plaintiff

had as much a vested right to take the *person* of the defendant, as his property, in order to obtain satisfaction of his debt. He was as much entitled to a *ca. sa.* as to a *fi. fa.* Indeed, the former is always considered as the most powerful and effectual means of enforcing payment. If the state legislature can take away the remedy for enforcing a judgment, by arresting the *person* of the debtor, why may they not modify, or vary the remedy against his property ? Is it not competent to the legislature to declare, if such a measure were wise or expedient, that *lands* should not be seized or sold under an execution, or that they should be *extended* only, as in *England ?* May they not exempt certain goods or chattels from execution?(a) Why have they not the power, also, to declare, that where a debtor, on petition of *three-fourths*, or *two thirds* of his creditors, in amount, shall deliver up to his creditors all his property, and obtain a certificate of discharge, that neither the person, nor the property which he shall thereafter acquire, shall be liable to be taken in execution for those debts ? If so, what, in effect, is the difference between a power to legislate in regard to the *remedy*, or in regard to the *debt?*

Again ; the Supreme Court of the *United States* say, that their opinion " is confined to the case actually under consideration." "It is confined to a case in which a creditor sues in a Court, the proceedings of which the legislature, whose act is pleaded, had not a right to control ; and to a case where the creditor had not proceeded to execution against the body of his debtor, within the state whose law attempts to absolve a confined insolvent debtor from his obligation. When such a case arises, it will be considered." Is this not an intimation that the Court do not mean to say, that a contract made, after the existence of an insolvent act, may not be discharged under it ? In the case before that Court, the debt arose, or the contract was made, before the insolvent act of *April* 3d, 1811, was passed.

(a) Vide 1 *N. R. L.* 506. sess. 36. ch. 50. s. 15. and sess. 38. ch. 227. *Sheep*, to the number of *ten*, and their fleeces, one cow, two swine, necessary wearing apparel, and bedding, necessary cooking utensils, &c. are exempted from execution and distress for rent.

The contract, in the case before this Court, was made after the insolvent act was passed, and between parties who are and were citizens of this state. The discharge, also, of the defendant was obtained under the 9th section of the act, at the instance of the creditor, and by which the proceeding is *compulsory* against the debtor. The cases, then, may be easily and satisfactorily distinguished. Though the state legislature cannot pass a law which impairs the obligation of a contract existing at the time, yet it may impose what terms or conditions it may think proper, on future contracts, to be made between its citizens. Where a law is passed in regard to future contracts, all contracts subsequently made must be deemed, as between the citizens of this state, to have been entered into in reference to that law. The parties must be understood as tacitly agreeing, that their contract is to be governed and regulated by the existing laws. In *Blanchard* v. *Russell*, (13 *Mass. Rep.* 1.) the Supreme Court of *Massachusetts*, (in *March*, 1816,) decided, that a discharge in this state, under the insolvent act of the 3d of *April*, 1811, was a good bar to an action brought in *Massachusetts*, the contract having been made in *New-York*, and the debtor a citizen of this state, though the plaintiff was not. The same objection was there made, that the insolvent act of this state was unconstitutional and void; but *Parker*, Ch. J. speaking of the objection, that it was a law impairing the obligation of contracts, makes the distinction for which we contend: " A law," says he, " which is in force when a contract is made, cannot be said to have that effect ; for the contract being made under the law, is presumed to be made in reference to it, and the parties are legally conusant of it at the time. The contract, in such case, is not impaired by the law ; for the law is a part of the contract."

When the constitution of the *United States* was framed and adopted, a similar insolvent act was in force in this state, having existed for many years. The constitution could have reference only to future laws, which might be passed by the states, impairing the obligation of existing contracts. The framers of that constitution never supposed, that the insolvent laws, then in force, came within the purview of that

NEW-YORK, section of the first article. Congress, also, has, on various
May, 1819. occasions, recognized the existence of these insolvent laws.
MATHER By the 61st section of the late bankrupt law, (6 *Cong.* sess. 1.
v. ch. 19.) passed *April* 4th, 1800, it was expressly declared,
BUSH. that " this act shall not repeal or annul, or be construed to
appeal or annul, the laws of any state now in force, or which
may, hereafter, be enacted, for the relief of insolvent debt-
ors, except so far as the same may respect persons who are,
or may be clearly within the purview of this act." So, in
the act to regulate the collection of duties, &c. passed
the 2d of *March*, 1799, the insolvent laws are recognized,
and a preference given, in the distribution of the assets,
to the debts of the *United States.(a)* This is a *legisla-
tive sense* of the meaning of the constitution. Has there
not been, also, after the lapse of *thirty* years, a *practical*
construction given to that instrument ? It was in *Golding* v.
*Prince*, decided in the Circuit Court of the *United States* for
the district of *Pennsylvania*, in *April*, 1814, (5 *Hall's Law
Journal*, 502.) by *Washington*, J. that we first hear a *judi-
cial* doubt suggested, as to the constitutionality of the state
insolvent laws. That was an action on a bill of exchange
dated the 10th of *May*, 1811, drawn by the defendant, in *St.
Bartholomews*, on himself at *Philadelphia*, at 90 days sight,
and the defendant pleaded his discharge under the insolvent
law of *Pennsylvania*, passed the 13th of *May*, 1812. Judge
*Washington* admits the distinction between laws retrospec-
tive, and prospective. " It may be proper," he says, " to
premise, that a law may be unconstitutional, and, of course,
void, in relation to particular cases, and yet valid, to all in-
tents and purposes, in its application to other cases, within
the scope of its provisions, but varying from the former in
particular circumstances. Then, as a law prospective in
its operation, under which a contract afterwards made may
be avoided in a way different from that provided by the par-

(a) Congress, on the 3d of *March*, 1803, passed " an act for the relief
of insolvent debtors within the district of *Columbia*," which discharges
the *person* of the debtor from imprisonment, though his after acquired
property, except wearing apparel, and bedding for his family, and his
tools of trade, is liable for the payment of his debts. (7 *Cong.* 2. sess.
ch. 84.)

ties, would be clearly constitutional, because, the stipulations of the parties which are inconsistent with such a law, never had a legal existence, and, of course, could not be impaired by the law. But if the law act retrospectively, as to other contracts, so as to impair their obligation, the law is invalid, or, in milder terms, affords no rule of decision in these latter cases."

In *Adams* v. *Storey,* decided in the Circuit Court of the *United States,* for the district of *New-York,* (1817,) *Livingston,* J. held, that the act of *April 3d,* 1811, was an insolvent act, not a bankrupt law; that if it were a bankrupt law, it could not be void, the several states having a right to pass bankrupt laws, until congress shall exercise its power of establishing an uniform system of bankruptcy; that an insolvent act extending to past as well as future debts, is not a law impairing the obligation of contracts, within the meaning of the constitution of the *United States;* and that a discharge under the insolvent act of the 3d of *April,* 1811, of a citizen of this state, might be pleaded, in bar to an action brought against him by a citizen of *Massachusetts,* for a debt contracted in that state.

In the case of the *Farmers' & Mechanics' Bank* v. *Smith,* decided in the Supreme Court of *Pennsylvania,* (1817,) (6 *Hall's L. J.* 547.) it was held, that the act of the legislature of that state, passed *March,* 1812, was a bankrupt act, and not an infringement of the constitution of the *United States.* Ch. J. *Tilghman,* in delivering the opinion of the Court, says, " I think, that the constitution has received a practical construction on this point, although I know that the weighty opinion of Judge *Washington* has lately been pronounced to the contrary." (*Golding* v. *Prince.*) By practical construction, he observes, that he did not mean *judicial* decision, but practice sanctioned by general consent. " It cannot be denied," he says, " that taking the words in their literal and fullest extent, contracts are impaired by a bankrupt law. But conventions intended to regulate the conduct of nations, are not to be construed as articles of agreement at common law." " It is of little importance to the public, whether a tract of land belongs to A. or B. In deciding their titles, strict rules of construction

may be adhered to, though sometimes at the expense of justice; because, certainty of title is thereby produced, and individual inconvenience is richly compensated by general good. But when multitudes are affected by the construction of an instrument, great regard should be paid to the *spirit and intention.*" If the words *impairing the obligation of contracts* are to be understood in their greatest extent, the consequences are alarming. " For all acts respecting divorce, all acts of limitation, all acts by which private property has been taken for public use, or for the use of chartered companies, for roads, canals, &c. would be void, because, in all these cases, contracts are impaired. It would be questionable, too, whether all insolvent laws, discharging the persons of debtors from imprisonment, would not be void."

Will this Court, then, in a matter of so much doubt and difficulty, and where the consequences are so serious, go one step beyond the case before the Supreme Court of the *United States*, and apply the reasoning adopted by Ch. J. *Marshall* to the present case, so different in its circumstances ?

*T. A. Emmet*, contra. The last clause in the opinion of Ch. J. *Marshall*, is wholly irreconcilable with the principle on which the judgment of the Court was founded. The legislature has no power to control the courts of justice contrary to the constitution. On all questions, as to the constitution of the *United States*, the courts of law must decide, and control the legislature of the state. In *Dash* v. *Van Kleeck*, (7 Johns. Rep. 477.) *Kent*, Ch. J. said, that the act of the legislature taking away a vested right, was absolutely void. The idea thrown out, at the conclusion of the opinion of the Supreme Court of the *United States*, is utterly at variance with the whole of the previous reasoning of the Chief Justice. It has, however, furnished the counsel for the defendant with an occasion for raising a subtle distinction. But will this Court listen to such a distinction, or to the suggestion that they are to go no further in compliance with the decision of the Supreme Court of the *United States*, than they can possibly help, yielding only a reluctant obedience to what should be regarded as the law of the land ? Could the legislature pass a law denying to the plaintiff any execution, ne-

cessary to give him the full effect of the judgment which he has obtained? If the judgment is valid, and a good ground of action, is it to be deprived of all the attributes of a valid judgment, and of all the remedies by which it is to produce any fruits? The true meaning of the observation is, that the *remedy* may be varied or modified, not that it can be taken away altogether.

If the defendant wishes to avail himself of his discharge, he will not be without remedy, for he may have a writ of *audita querela.* (4 *Johns. Rep.* 191. 1 *Bac. Abr.* 509. *Audita Querela* (B.) ) If the creditor brings an action of debt on his judgment, he will be entitled to a *ca. sa.* as well as a *fi. fa.* ; yet the S. C. of the *United States* say that his *person* is duly discharged from imprisonment. It is true, that in *England* since the statute of 32 Geo. II. c. 28. s. 20. debt cannot be brought on a judgment where the defendant has been discharged out of custody, under the act, called the *Lords' Act.* (1 *Chitty Pl.* 104.) The provision of the constitution of the *United States* is general, and extends to every matter arising *ex contractu;* it applies to judgments as well as to bonds or notes.

The Supreme Court do not take notice of the case of *Blanchard* v. *Russell,* and this silence affords a strong ground to conclude, that they did not consider the distinction there taken as sound; and the case of *M'Neil* v. *M'Millan,* decided at the same term, clearly shows that they did not mean to adopt that distinction. But it is quite useless to take notice of the decisions of state courts or inferior tribunals, since the judgment of the S. C. of the *United States* on this point, must be regarded as the paramount law.

It is said that the existing law forms a part of the contract between the parties. But a contract is defined to be a bargain or agreement between two or more persons to do, or not to do, some lawful act. (1 *Comyn on Cont.* 2. *Poth. Oblig.* 3, 4.) How, then, does the insolvent law make any part of it?

*S. Jones, Jun.* and *Wells,* in reply. No law can be said to impair the obligation of a contract which was not in existence at the time the law was passed. This is a contract

made between citizens of this state, subsequent to the existence of the insolvent law, and must be deemed to have been made in reference to that law. Ch. J. *Parker,* in *Blanchard* v. *Russell,* states the true principle on this subject. Every contract is made in reference to the existing laws of the state of which the contracting parties are citizens, and who are understood as tacitly consenting, that their contract shall be construed and governed by the existing laws of their country. (*a*) On this principle rest all those decisions which have been made in our Courts, according to the *lex loci contractus.* (1 *Johns. Cas.* 139. 2 *Johns. Rep.* 198. 235. 3 *Johns. Rep.* 268. 1 *Caines' Rep.* 402. 3 *Caines' Rep.* 154. 7 *Johns. Rep.* 117. 8 *Johns. Rep.* 189. 11 *Johns. Rep.* 144. 12 *Johns. Rep.* 142. 14 *Johns. Rep.* 338.) The law of every state where a contract is made, does enter into and make part of the contract. All *implied* or *quasi* contracts owe their existence and force to the law. So in contracts depending on *commercial usage,* which is part of the common law, the usage or law makes part of the contract. The law, in a thousand instances which might be mentioned, does interfere, and aids, modifies, or regulates, the contracts of parties.

The *cessio bonorum,* as to its operation and effect, varies, in different countries, according to the policy of each ; and it is respected in other countries, according to the principle of the *lex loci contractus.*

The case of *Sturges* v. *Crowninshield* arose under the insolvent law of *April* 3, 1811, passed subsequently to the contract ; but, in fact, the law of 1811 was merely a new modification of the former, or *three-fourth* act, and was part of a *system* of laws on this subject, coeval with the existence of this state. The case now before the Court, arises under the act of *April* 12, 1813, and the contract and discharge are subsequent to the passing of the act. This act is no more than a revision or re-enactment of the old law. The court will not hesitate to adopt the distinc-

(*a*) Vide *Consequa* v. *Fanning,* (3 *Johns. Ch. Rep.* 598.) where Chancellor *Kent* adopts the principle, that every subject is to be deemed a party to the laws of his own government. (*Touteng* v. *Hubbard,* 3 *Bos. & Pul.* 291. *Conway* v. *Gray,* 10 *East,* 536.)

tion which has been stated, if it is well founded, so as to take this case out of the principle of the one decided by the S. C. of the *United States.* The judgment of that Court, so far as it is to be obeyed as an authoritative adjudication, must be confined to the actual facts of the case before the Court. The general observations of the judges, farther than the facts of the case rendered them necessary, are to be regarded as mere *obiter dicta.* This Court has never allowed it to be drawn into question, whether the insolvent laws were constitutional or not. Will it be said that a state can pass no law to restrain or abridge the unlimited power of its citizens to contract as they please ? Can a state pass no law against banking, no statute of limitations, nor against *usury* ? Is not a contract to pay *ten* or *twenty* per cent. *interest,* as much a contract, as a promise to pay the *principal ?* Has the state legislature no power to regulate the rate of interest ? But does not a law against usury, by which contracts for a greater rate of *interest* than seven per cent. are made void, impair the obligation of a contract?

The truth is, that the constitution of the *United States,* in declaring, that no state should " pass any bill of attainder, *ex post facto* law, or law impairing the obligation of contracts," merely intended to prevent the states from doing acts of palpable injustice, as to destroy or impair an existing and lawful contract, or to take away a vested right. It never meant to interfere with the power of the states to pass such *prospective* laws as they might deem necessary to promote the general good of their citizens. Did the framers of the constitution mean to subvert or annul that *system* of laws relative to insolvent debtors in this state, which had, from its first origin as a political state, been incorporated into its laws ? If such had been known to be the intention of the framers of that instrument, at the time, it is certain, that that clause, at least, of the constitution would never have been adopted by the people of this state.

Chief Justice *Marshall* seems to doubt, whether the power given to congress to pass a bankrupt law, confers on them the power to pass insolvent laws. If it be so, then, neither the constitution, nor congress can, interfere in cases of insolvency. If the states have the power to pass insolvent

NEW-YORK,<br>May, 1819.<br><br>MATHER<br>v.<br>BUSH.

NEW-YORK,  laws, they have the power to discharge the after acquired
May, 1819.  property, as well as the person of the debtor. If it had
MATHER     been intended by the constitution to destroy the whole sys-
v.         tem of state insolvent laws, the power to pass such laws
BUSH.      would have been expressly given to congress. An insolvent
act, or *Lords' act,*(a) or a *cessio bonorum*, never was consi-
dered, in any country, as impairing the obligation of con-
tracts, or as taking away vested rights. If it did destroy
vested rights, the law would be void, on general principles,
and it was not requisite for any formal declaration to be in-
serted in the constitution.

The principle of the *cessio bonorum*,(b) or insolvent act,

---

(a) The statute of 32 *Geo.* 2. ch. 28. called the *Lords' act*, discharged
a prisoner in execution, whose debt did not exceed 100 pounds, which
sum was, afterwards, by 33 *Geo.* 3. ch. 5. increased to 300 pounds, and
made perpetual. Like the *cessio bonorum*, it discharges the person only
of the debtor from imprisonment, and future arrest; the debt is not dis-
charged, and the creditor is entitled to have execution against any pro-
perty the debtor may, afterwards, acquire. The provisions of this act
have been incorporated into *our act for the relief of debtors with respect
to the imprisonment of their persons.* (36 sess. ch. 81. 1 *N. R. L.* 348.)

(b) The *cessio bonorum* of the *Roman* law, was first introduced into
*Italy* by *Julius Cæsar*, and was, afterwards, modified by the Emperors,
who extended it to the provinces. It mitigated the extreme severity of the
ancient law, (*Bynk. Obs. Jur. Rom. Lib.* I. c. 1. *Aul. Gell.* 20. s. 1.
*Bouch. Comment. sur la loi des* XII. *Tables,*) by releasing the debtor who
delivered up all his estate to his creditors, from the most degrading servi-
tude. Though regarded as the sad and miserable refuge (*flebile et mi-
serabile auxilium*) of the unfortunate, still it was a benefit or favour
which the law allowed only to the honest and *bona fide* debtor; those
who had secretly and fraudulently assigned their property, who had
dissipated their fortunes in luxurious living, or wasted their substance
by thoughtless extravagance, or had contracted debts with a view to a
cession, were denied the benefit of it. The debtor was bound to make
a full surrender of all his estate, real and personal, excepting only his
wearing apparel; and a certain number of days were allowed, in order to
ascertain whether any part of his property had been secreted.

The *cession* did not transfer the absolute property to the creditor, but
merely the right of converting, by a public sale, the estate of the debtor,
under the direction of the *Prætor*, into money, and applying it towards
the payment of the debts. It did not operate as a satisfaction of the
debts, or extinguish their obligation. It merely exempted the *person* of
the debtor from impsisonment, and from arrest or execution. If after
his release from prison, or bondage, the debtor acquired property, it was

is consonant to the principles of justice and sound policy. It does not violate contracts. All bankrupt laws rest on the same principle. If an insolvent act or bankrupt law is immoral or unjust, or violates contracts, on what better foundation rests the power of congress to pass a bankrupt law? Would it be wise or politic in this age of commerce, in a highly commercial country, to subject the future acquisitions of an honest, but unfortunate debtor, who has fairly surrendered all his property to his creditors, to the payment of those debts? Will not such a principle paralise the exertions of a debtor, struggling to support his family, and, if possible, to retrieve his fortune? Will it not take away every stimulus to activity and enterprise, sink him into despair, and render him an idle and useless member of society? Does it not hold forth the strongest temptation to the practice of fraud, and of every shift and contrivance, which ingenuity can invent, to cover his future acquisitions from the grasp of those creditors, for whose benefit the debtor has once stripped himself of all his property? Indeed, it might be fairly questioned, whether it would not be better to leave the debtor entirely to the mercy of his creditors,

liable to his creditors, until they were fully paid. But if this after acquired property was moderate, (*modicum*) or no more than was sufficient for his maintenance, according to his character and station in life, it could not be again sold by his creditors, but might be retained. A *cessio bonorum* was not allowed, in regard to debts due to the *fisc*, or public treasury, nor for fines and penalties, imposed for public offences; nor did it extend to the *sureties* of the debtor. (*Dig. lib.* 42. *tit.* 3. *De cessione bonorum. Code lib.* 7. *tit.* 71. *Qui bonis cedere possunt. Voet at Pand. h. t. Perezius ad Cod. h. t. Heinec: ad Pand. h. t. Pars* 6. *s.* 248, 249, 250. 3 *Pand. Inst. in Nov. Ord. Dig. par Pothier,* 174. *B.* 42. *tit.* 3.)

The *cessio bonorum* was introduced into all those countries of *Europe*, which adopted the civil law as the basis of their jurisprudence, and now, with very little variation, forms a part of their respective codes. (*Heinec. Elem. Jur. Germ. Lib.* 2. *t.* 13. *s.* 379. 387. *Bynk. Quæst. Jur. Priv. lib.* 2. *ch.* 12. *Code Napoleon,* 1268, 1269, 1270. *Nouv. Ferriere Dict. De Droit, &c. par D'Agar. Ersk. Inst. of L. of Scotland,* 487, 488. *B.* 4. *tit.* 3. *s.* 12, 13. 7. In some of the states or provinces of *Germany,* insolvent debtors are not allowed the benefit of the *cessio bonorum*; but are detained in prison, at the pleasure of their creditors, and depend on occasional charity for support.

than to exempt the *person* only from imprisonment, but leave all his future acquisitions to be seized by his creditors. The writ of *audita querela*, is never resorted to, except in very particular cases, and that remedy has become almost obsolete. Relief, by motion, has been substituted as a more cheap, expeditious, and liberal remedy.

*Emmet.* The *cessio bonorum* of the *Roman* law, and the *English* insolvent acts, discharged only the *person* of the debtor. *England*, under a bankrupt law, and this species of insolvent law, has risen to the highest degree of commercial prosperity ; and the framers of the constitution must be supposed to have had the laws and policy of that country in view, when they declared, that congress should have the power to pass a bankrupt law, and that no state should discharge a debtor from the obligation of his contract.

The law does not make or supply the contract of the parties. It merely supplies the *evidence*, or furnishes the *remedy*. We resort to the *lex loci contractus*, not to make a contract, but to find *evidence* to show what it is. *Usage of trade*, or of the rate of interest of the country, are introduced in evidence, merely to show the intention of the parties. When that is ascertained, it must prevail.

SPENCER, Ch. J. delivered the opinion of the Court. A motion has been made in this case, to set aside the execution, on the ground, that since the rendition of the judgment, the defendant has been duly and regularly discharged, under the insolvent act of this state, passed the 12th of *April*, 1813. (1 *N. R. L.* 460.) It appears that the contract on which the judgment was founded was entered into in *March*, 1816 ; and that the discharge of the defendant under the insolvent act, was granted on the 16th of *August*, 1817. It further appears, that the parties were both citizens of this state, resident therein when the original contract was made, on which the judgment was rendered, and have ever since continued to be resident within the state.

Were it not for the decisions pronounced in the Supreme Court of the *United States*, at the last term, we should not hesitate, for a moment, in ordering the execution in this

cause to be set aside, as irregularly and illegally issued ; and nothing but the consideration, that that Court has a paramount and controling jurisdiction in cases involving a construction of the constitution of the *United States*, has induced this Court to permit the question, as to the constitutionalty of the insolvent law, to be argued. It cannot be doubted, that if the point which the present motion involves, could be thrown into the form of pleading, so that a record could be made up, if this Court should pronounce a judgment adverse to the claim or title set up by the plaintiff under the constitution, a writ of error might be brought and ultimately carried to the Supreme Court of the *United States*. If, then, that Court has pronounced judgment on the precise point arising in this case, though we have the power of disregarding it, our duty to the suitors in this Court, and the respect which we feel and owe to the Court of the *last resort*, must induce us, whatever may be our individual opinions, to surrender them up, and yield that obedience which the constitution and laws of the *United States* exact of us.

In the principal case of *Sturges* v. *Crowninshield*, the contract was entered into prior to the act of the 3d of *April*, 1811 ; and the defendant set up in bar of the suit, a discharge from his debts under that act ; and it is not to be denied, that the act of 1811, made important changes in the insolvent system of this state. It authorized a discharge, on the petition of the debtor only ; whereas, before that period, the concurrence of three-fourths in value of the creditors, was required, to give to an insolvent a discharge from his debts ; and the act of the 12th of *April*, 1813, requires two-thirds in value of the creditors to join in a petition with the insolvent.

The Supreme Court of the *United States* held the discharge to be void, and, so far as it attempted to discharge the defendant from the debt, that the act of 1811, was contrary to that part of the 10th section of the first article of the constitution, which prohibits a state from passing any law *impairing the obligation of contracts*. The case of *McMillan* v. *McNeil*, was subsequently decided. In that case both the parties resided in *South Carolina*, and the debt demanded was contracted in that state.

*M'Millan* removed into the state of *Louisiana*, where he was discharged on a *cessio bonorum*, as well his person as his property, from all debts then existing, due or owing by him. The Court held, that this case was not distinguishable in princible from the preceding one; and that the circumstance that the state law under which the debt was attempted to be discharged, was passed before the debt was contracted, made no difference in the application of the principle.

We are decidedly of opinion, that neither of these cases decide the question presented in this case, and that there is a material and manifest distinction between them. In the leading case, the Court cautiously declare, " that their opinion is confined to the case actually under consideration." This is intelligible language, and it was meant, we presume, to admonish state courts, that notwithstanding the train of reasoning adopted in announcing the decision of that Court, the Court itself did not mean to express an opinion upon cases differently circumstanced. Another qualification of the opinion is not quite so obvious, that " it is confined to a case in which a creditor sues in a Court, the proceedings of which the legislature whose act is pleaded had not a right to control." It cannot be conceded, that the legislative power can control the judgment of a court upon a question involving a construction of the constitution ; but, most probably, the observation had reference to the form and mode of proceeding. It is, however, unnecessary to pursue the inquiry, as the legislature have not interposed in any way.

It has been contended, very earnestly, that it necessarily results from the two cases adjudged in the Supreme Court of the *United States*, that an insolvent or bankrupt law of the State, would be a violation of the constitution, as impairing the obligation of contracts, if such law discharged the debtor absolutely from his debts, notwithstanding both debtor and creditor were citizens of the state whose legislature passed such law ; and, notwithstanding the contract was made after the enactment of the insolvent or bankrupt law, and was to be performed within the state.

Having already observed, that we bow to the supremacy of the Supreme Court of the *United States ;* and feeling a

disposition to give a full and fair effect to their decision on this question, so far, and so far only, as we perceive they have actually decided, it would be unfit and irregular to analyze the reasoning and illustrations of that Court, in the opinion delivered, any farther than to show that the point now presented was not intended to be decided.

The Court, very correctly, define a contract to be, " an agreement in which a party undertakes to do, or not to do, a particular thing; the law binds him to perform his undertaking, and this is, of course, the obligation of his contract."

But if a law, of binding force and influence upon the contracting parties, as citizens of the same State, co-exists with the contract, which provides, that if the party, " who undertakes to do, or not to do, a particular thing," shall, by misfortune, become utterly unable to perform his undertaking, and that if he shall, in a certain manner prescribed, make a fair and honest cession of all his estate, for the benefit of all his creditors, that then he shall be absolutely absolved from all his debts, is not the agreement by which he undertook to do, or not to do, a particular thing, qualified by such a law; and is there not an implied condition, that the party shall be absolved from its performance, if the event takes place which the existing law declares shall dispense with the performance of the contract according to the letter?

We think this question must be answered in the affirmative; and then it necessarily results, that such an insolvent or bankrupt law, in force when the contract was made, does not, in the sense or meaning of the constitutional provision, impair the obligation of such contract. On this point, the Supreme Judicial Court of *Massachusetts* have unanimously expressed an opinion which commands our full assent. In the case of *Blanchard* v. *Russell*, (13 *Mass. Rep.* 16.) they say, " a law which is in force when a contract is made, cannot be said to have that effect; (of impairing the obligation of contracts;) for the contract being made under the law, is presumed to be made with reference to it, and the parties are legally conusant of it at the time. The contract in such case is not impaired by the law, for the law is a part of the contract."

NEW-YORK,
May, 1819.

MATHER
v.
BUSH.

It is believed, that this position is universally recognized in courts of justice. *Huberus*, (vol. 2. b. 1. tit. 3.) in a very learned disquisition on the effect of the *lex loci contractus*, lays down the proposition that, " by the courtesy of nations, whatever laws are carried into execution within the limits of any government, are considered as having the same effect every where, so far as they do not occasion a prejudice to the rights of other governments or their citizens." In the case of *Talleyrand* v. *Boulanger*, (3 *Ves. jun.* 449.) Lord Chancellor *Thurlow* observed, that it would be contrary to all the principles which guide the courts of one country, in deciding upon contracts made in another, to give a greater effect to the contract than it would have by the laws of the country where it took place. In the case of *Melan* v. The Duke *De Fitzjames*, ( 1 *Bos. & Pul.* 138.) on a motion to discharge the defendant on common bail, it appeared that the contract was entered into in *France*, and although it purported to be a personal engagement to pay a sum of money, it was shown that by the laws of *France*, the defendant could not be arrested or imprisoned on such a contract; and the Court discharged the defendant, on his entering a common appearance. Chief Justice *Eyre* held, that when the ground of the debt is a transaction in a foreign country, it does not originate in the laws of *England*, but in the law of that country which created the obligation; and he said he could not conceive, that what is no personal obligation in the country in which it arises, can ever be raised into a personal obligation by the laws of another. *Rooke*, Justice, observed, if the law of *France* has said that the person shall not be liable on such a contract, *it is the same as if the law of France had been expressly inserted in the contract ; if,* (he says,) *it had been specially agreed between the parties not to consider the Duke's person liable, and under those circumstances he had come over here, there would have been no difference between us ; for if it were agreed there that the person should not be liable, it would not be liable here.* *Heath*, Justice, differed from the other judges, considering the contract a personal one, and that the remedy must be pursued according to the law of the country where the parties reside. He concurred in the general principle, that in

construing contracts, the laws of the country in which they
were made must govern, for, (he says,) *all contracts have a
reference to such laws.* It appears to us, that this reasoning
is conclusive upon the point before us. It cannot be con-
troverted, that the parties to a contract are to be deemed
acquainted with the laws of that state of which they are
citizens, and in which they are contracting. They must
be deemed conusant of those laws which regulate, control,
or affect their contracts; and in construing a contract for
the payment of money, thus entered into, it must be un-
derstood in reference to any existing law which bears
upon it, and may modify or control it. It is the same,
then, in effect, as if the insolvent act of *April,* 1813,
had been expressly inserted in the contract, on which
the judgment in this case was rendered; and the sub-
stance of the agreement between the parties is, that the
contract shall be literally fulfilled, unless the defendant
becomes an insolvent debtor within the meaning of the act
of 1813, and is duly discharged from his debts. Would
the obligation of the contract be impaired, if the insolvent
act of 1813 had been actually embodied into the contract?
Would the objection to the constitutionality of that act be
listened to in any court of justice, where the party to
whom the undertaking was made had received it, and
contracted upon that condition? We apprehend not.

The opinion of the Supreme Court further states, " that
it is not true that the parties have in view only the pro-
perty in possession when the contract is formed, or that its
obligation does not extend to future acquisitions : industry,
talents, and integrity, constitute a fund, which is as con-
fidently trusted to as property itself; future acquisitions
are, therefore, liable for contracts, and to release them
from this liability impairs their obligation." These ob-
servations are exclusively applicable to the case then
under consideration, in which the law was posterior to
the contract under which the defendant set up, as a bar to
the suit, his discharge. But, with all deference, they would
not be correct, if applied to the present case; for if the par-
ties contract in reference to the existing laws of the State,
they have not in view future acquisitions, if an insolvency

NEW-YORK,
May, 1819.

MATHER
v.
BUSH.

occurs, and the debtor complies with the requisitions of the law, and is discharged under it from all his debts. How could the creditor, under such circumstances, have in view after acquired property, when the law admonished him that such property would be intangible for debts contracted before the discharge? With respect to the industry, talents, and integrity which are supposed to constitute a fund, which is as confidently trusted to as property itself; if the debtor had an idea, that after being irretrievably ruined, and borne down, by the magnitude and weight of his debts, his future acquisitions would be liable to be seized upon, as soon as they were gotten, it is very easy to conceive that every incentive to industry would be utterly extinguished, and further acquisitions would be of little or no value.

The Supreme Court of the *United States*, to leave no doubt that they had not in view a case like the present, observe : " Although the states may, until that power shall be exercised by Congress, pass laws concerning bankrupts, yet they cannot, constitutionally, introduce into such laws a clause which discharges the obligations a bankrupt has entered into :" thus plainly indicating, that a bankrupt law, which a state may pass, must, to have the effect of discharging the obligations of debtors, be prospective, not retrospective.

The opinion distinguishes between a case impairing the obligation of a contract, and operating directly upon it, and a law affecting or modifying the remedy upon the contract; the latter is admitted to be under the control of the legislative power of a state ; and, although we may not feel the full force of the distinction, it does not become us to analyze the opinion, or to reason upon it, any farther than to observe, that the remedy is essential, in many cases, to the contract ; and to modify it, so as to frustrate the contract, or render it less valuable, would have the indirect effect to impair its obligation.

In many of the states, real property cannot be sold on execution ; and when there is a failure of personal property to satisfy the creditor, in some of the states, the real property of the debtor must either be left untouched, or be taken at the appraisal of indifferent men ; and in some one or more of the states, real property is *extended*, and the

creditor is to be satisfied out of the rents and profits. It is
not supposed that the Court meant to say, that these laws
were unconstitutional. It is true, that they relate to the
remedy which a creditor may use to enforce the payment
of his debt; and if the law existed when the contract was
made, the creditor could not complain, for he contracted
with reference to the law, and knew, or ought to have
known, that the real property of his debtor could not be
sold; but if a law were to be passed posterior to the con-
tract, either withdrawing the debtor's real property from a
liability to satisfy his creditor, or obliging him to go unpaid,
unless he would accept land not contracted to be taken, in-
stead of money which was stipulated to be paid, the creditor
might complain, with some justice, perhaps, that his contract
was impaired.

Many cases might be put in which the *lex loci* becomes,
impliedly, part and parcel of the *res gesta*. If a sum of
money is stipulated to be paid on a day certain, and the
contract is silent as to interest, the law attaches on the con-
tract, and declares interest shall be paid thereafter; for this
the parties have tacitly made part of the contract. So,
also, in all cases of implied promises, the law raises them,
and the parties have virtually, though not actually, so con-
tracted; as in actions for money had and received, or goods
sold, when there had been no express convention of the
parties.

In the case of *M'Millan* v. *M'Niell*, the parties having
contracted in *South-Carolina*, had no reference to the laws
of *Louisiana*, and the laws of the latter state formed no
part of the contract; nor did they attach upon, or control it,
in its concoction. The application, therefore, of the laws
and proceedings of *Louisiana*, to a contract made in *South-
Carolina*, between citizens of that state, and annulling the
contract at the instance of the debtor, when the creditor was
beyond the control, and out of the reach, of their jurisdic-
tion, was, assuredly, a case widely different from that under
consideration; and it was, in our apprehension, correct to
say, that the law of *Louisiana*, having been passed before the
debt was contracted in *South-Carolina*, made no difference
in the application of the principle laid down in *Sturges* v.

NEW-YORK,
May, 1819.

*Crowninshield.* On the whole, after our laws of insolvency have been continued, with very little variation, except as to the act of 1811, from the period of the formation of the constitution of the *United States;* after we have repeatedly pronounced regular and fair discharges under them, to be valid and effectual, for such a series of years; and when the cases decided by the Supreme Court of the *United States* are so perfectly distinguishable from the case now presented, it is too much to ask this Court to take a step in advance of the Supreme Court of the *United States,* and to anticipate their decision, on a question certainly not decided. We are, therefore, unanimously of opinion, that the execution issued in this case be set aside, with costs. We reserve our opinions, until the next term, upon the motions to set aside the executions issued on judgments, from which the defendants were discharged under the act of the 3d of *April,* 1811; and also upon the motions for leave to issue writs of *scire facias :* those cases require more consideration than the limited time of this term will enable us to bestow.

YATES, J. not having heard the argument, gave no opinion.

