1828.

Ward
v.
Van Bokkelen.

---

[*100]

*WARD v. VAN BOKKELEN.

An injunction on coming in of the answer will not be dissolved, unless the defendants positively deny all the equity of the bill. A denial from information and belief is not sufficient.

Twenty years, by analogy to the statute of limitations, is the period allowed in Chancery for commencing proceedings to set aside conveyances of real estate on the ground of fraud.

Where the complainant suffered three years to elapse without compelling an answer from one of several defendants, and the other defendants in their answer charged collusion between the complainant and the defendant who

had not answered; it was held that under such circumstances, the fact that all the defendants had not answered, could not be urged as an objection to the dissolution of an injunction, unless the complainant denied upon affidavit, all collusion, and stated sufficient reasons for not compelling an answer from all the defendants.

1828.

Ward
v.
Van Bokkelen.

*Slosson*, on behalf of the defendants who had answered, moved to dissolve the injunction granted in this cause, restraining the defendants from taking out of court certain moneys, which were the proceeds of certain premises sold under a mortgage, alleged in the bill to have been fraudulently given by one John Post to Mrs. Morris, under whom the defendants claimed. The complainant claimed under a judgment against John Post. The injunction also restrained the defendants from disposing of all that part of the real estate which had been conveyed by John Post to Mrs. Morris, and which was still held and possessed by the defendants. Mary Post, one of the defendants, had not answered. Mr. Slosson cited *Deypeyster* v. *Graves*, (2 Johns. Ch. R. 148.)

June 6th.

*G. Griffin*, contra, objected to the motion, that the answer did not positively deny the fraud charged in the bill, that swearing as to belief and information was insufficient. He contended, also, that the defendants should all answer before this motion could be made. He cited *Roberts v. Anderson*, (2 John. Ch. R. 202,) and Wyat's Pr. Reg. 234.

THE CHANCELLOR :—The answer in this case is put in by defendants, who probably knew nothing of the transaction charged in the bill to have been fraudulent. Their answer, of course, can only deny the equity of the bill, by information *and belief. They cannot deny the facts stated therein upon any knowledge they possess. The answer, therefore, is not sufficient to authorize a dissolution of the injunction. *Roberts* v. *Anderson*, (2 John. Ch. R. 202.) Independent of the complainant's oath to the bill, the facts stated therein, and admitted by the answer, show a case of

[*101]

1828.

Ward
v.
Van Bokkelen.

suspicion. The single circumstance, that the person against whom the decree of this court was obtained, conveyed a large estate to his mother in law, within a few days after the decree, and before it could be enrolled and enforced against the property, is sufficient to raise a doubt as to the validity and honesty of that transaction.[1]

If the conveyance was fraudulent, no period of time, short of twenty years, will prevent the persons intended to be defrauded thereby, from pursuing their remedy against the land in the hands of the fraudulent grantee, or her heirs or devisees. Twenty years is the shortest limitation of actions at law respecting real property in this state, and by analogy to the statute of limitations, that is the shortest period which can bar a proceeding in this court to set aside conveyances of real property, on the ground of fraud.[2]

In this case, it is no objection to the dissolution of the injunction, that Mary Post has not answered. The complainant has suffered nearly three years to elapse, without taking any steps to compel an answer from her, and it is suggested in the answer of the other defendants, that there is collusion between her and the complainant. Under such circumstances, if he wished to rely upon the objection that she had not answered, in opposing this motion to dissolve the injunction as to the other defendants, he should have produced an affidavit denying the collusion, and showing why he had not compelled her to answer. But for the

(1) *Apthorpe* v. *Comstock*, 1 Hop. 140; *Little* v. *Marsh*, 2 Iredell's Eq. 18; *Poor* v. *Carleton*, 3 Sumner, 70; *Norton* v. *Woods*, 5 Paige, 260; *Manchester* v. *Day*, 6 id. 295; *Everly* v. *Rice*, 3 Green. Ch. 553. See further Am. Ch. Dig by Waterman, tit. *Injunction*.

(2) Effect will be given to the statute of limitations in equity as well as in law. *Lewis* v. *Marshal*, 1 McLean, 16; *Lewis* v. *Marshal*, 5 Pet. 496; *Humbert* v. *Trinity Church*, 24 Wen. 587; *M'Crea* v. *Purmont*, 16 Wen. 460; *Thomas* v. *Harvie*, 10 Wheat. 146. But the statute of limitations is not always applicable to cases of equitable cognizance merely; *Attorney-General* v. *Purmont*, 5 Paige, 620; it is *generally* adopted; *Humbert* v. *Trinity Church*, *supra*; cases of fraud excepted: *Michoud* v. *Girod*, 4 How. U. S., 503; *Marks* v. *Pell*, 1 John. Ch. 594.

the institution. The complainant was chosen president, and Edward C. Priest was appointed cashier.

1828.

McLaren
v.
Pennington.[1]

The bank commenced operations on the first of June, 1825, and within thirty days thereafter obtained the receipt of the treasurer of the state for the $25,000, required to be paid by the last section of the act of incorporation. The bank continued in operation until the 18th of November, 1825, when it stopped payment. At the time the complainant held 1,444 shares, being merely three-fourths of all the stock subscribed; and the bank held his stock notes, for $114,400, payable to Edward C. Priest, cashier of the bank, and for the security thereof, 1,144 shares of his stock were pledged. On the 23d of November, in the same year, the legislature of New Jersey repealed the act of incorporation, and appointed the defendants, together with Caleb S. Riggs, who is since dead, trustees; and authorized them, or a majority of them, to demand, sue for, collect and receive, and take into *their possession, all the goods and chattels, rights and credits, moneys and effects, lands and tenements, books of account, securities for money, evidences of debts, and all property of every nature and description, belonging to the bank at the time of passing the repealing act; and to sell and convey all the personal estate of said corporation, and pay into the Court of Chancery the proceeds of the corporate property, debts and funds, to be disposed of equitably, under the order of the Chancellor, amongst the creditors of the corporation, after allowing to the trustees a reasonable compensation for their trouble. On the 10th of December, 1825, the legislature passed a supplementary act, with a preamble reciting that doubts had arisen, touching the powers and duties of the trustees, and that it was the intention of the repealing act to preserve uninjured and unimpaired, all the then existing rights and responsibilities, whether in favor of, or against the said bank; and then enacting and declaring, that the trustees were, and from the passing of the repealing act, should be deemed, and taken to have been vested as trustees for the

[*104]

creditors of the said bank, and the stockholders existing at the time of the passing of the act of repeal, with all the estate, real and personal, in law and equity, and with all the credits, rights in action, debts and demands whatsoever, lawfully belonging to, or vested in the said bank, at the time of the repeal of the charter. And the trustees, or the survivors of them, are authorized to institute suits in their own names, as "trustees of the creditors and stockholders of the New Jersey Protection and Lombard Bank," for any such debts or property, and to compound and settle debts and claims, and allow offsets, &c.

*P. W. Radcliff* and *P. A. Jay*, for the defendadts:—The complainant is too late in his motion to amend his bill. He should have asked to amend, as soon as the defect was discovered. The stock subscribed by the complainant was a sufficient consideration for his stock notes. The failure of the bank, and the depreciation of this stock thereby, is no defence to an action upon these notes, either at law or in equity; and the complainant can interpose the same defence *to these notes as if he had been sued thereon by the directors of the bank.

The stock was not apportioned in the manner required by the charter. The bank went into operation before the sum required was paid in. In fact there was an entire want of capital when the bank commenced business. When the bank stopped payment, the complainant held nearly three-fourths of the stock, for which he had given his note to the bank without security. These reasons were sufficient to authorize the legislature of New Jersey to repeal the charter, and appointed the defendants trustees to take possession of the effects of the bank. It was not necessary to assign these reasons upon the face of the act. The act repealing the charter was constitutional, as the right of repeal was reserved by the legislature of New Jersey in the act of incorporation. It was one of the conditions of the contract to which the stockholders acceded. The rule that a condition repugnant to a

grant is void, does not apply to a contract between a legis-
lature and a citizen; as the legislature is omnipotent and
can alter the law. Here the power of repeal was reserved.
The exercise of this power does not, therefore, come within
the clause of the U. S. constitution, prohibiting every law
which will impair the obligation of contracts. The fact of
the bank having paid a bonus to the state of New Jersey
for its charter, did not take away the right of repeal. It
is like the case of a tenant at will who has paid a consider-
ation to his landlord, but is nevertheless liable to be ejected
whenever the landlord thinks proper to determine the ten-
ancy. The state of New Jersey had power to appoint trus-
tees. This state authorizes the appointment of receivers.
The legislature of New Jersey possessed the power of re-
pealing this charter without any judicial investigation.
Estates have been confiscated without trial. So have estates
tail been abolished without trial. This court will presume
the charter of this bank was violated before the legislature
of New Jersey repealed it. The complainant cannot object
that the legislature of N. J. have destroyed the stock, he
being *particeps criminis*, having with others produced that
state of things which caused the legislature of that state to
*interfere thus summarily. The bill being for discovery [*106]
merely, it may be dismissed without setting down the cause
for argument. *Brandon* v. *Sands*, (2 Ves. jun. 514.)

*J. Tallmadge* and *D. B. Ogden*, for the complainant:—The
complainant is not too late in his application to amend his
bill, by adding a prayer for general relief. (12 Ves. 48, 62,
64, 66; 15 Ves. 358.) The court will retain this cause.
The complainant being lawfully here, this court ought not
to send him back to a court of law. Where a court of
chancery gains jurisdiction for one purpose, it may retain
the bill generally. (*Rathbone* v. *Warren*, 10 John. 587;
*King* v. *Baldwin*, 17 John. 384.) The complexity of cir-
cumstances in this case, will induce the court to retain ju-
risdiction of the cause. The complainant cannot avail him-

1828.

McLaren
v.
Pennington.

self of his offset at law, which is there limited solely to the parties on the record. (*Wheeler* v. *Raymond*, 5 Cowen, 231; *Johnson* v. *Bride*, 6 Cowen, 693.) A mere agent being holder of a note may sue, and his right cannot be inquired into at law, unless he is the holder of the note by fraud. (*Pierson* v. *Crafts*, 12 John. 90; *Murray* v. *Judah*, 6 Cowen, 484.) Courts of law only look to the parties upon the record. (*Mauran* v. *Lamb*, 7 Cowen, 171; *Conroy* v. *Warren*, 3 John. Cas. 263; *Payne* v. *Eden*, 3 Cain. 213.) In this case, the bank having paid a consideration for its charter, it had vested rights which the legislature of N. J. could not defeat. (*Dartmouth College* v. *Woodward*, 4 Wheaton, 518.) No condition could be annexed inconsistent with the grant. *Bradley* v. *Peixoto*, 3 Ves. jun. 328; Co. Lit. 243; 2 D'Anver's Abr. 22; *Rosevelt* v. *Thurman*, 1 John. Ch. R. 220; *Jackson* v. *Shultz*, 18 John. 174.) Under the clause in the act of incorporation reserving the right of repeal, the legislature of N. J. had no power, for any special cause, to revoke the grant. If they had this power, it could only be exercised upon an inquiry by commissioners, or upon a judicial investigation, establishing the existence of such special cause. The appointment of trustee to take charge of the property and effects of the bank was void. (*Bank of Columbia* v. *Oakley*, 4 Wheaton, 236, 245; *Young* v. *Bank of Alexandria*, *4 Cranch, 395.) These cases make a distinction between corporate franchises and ministerial injunctions, which furnishes a clue to a true construction of this repealing clause. The act of repeal blighted the whole stock of the bank. The consideration of the complainant's notes consequently failed. When the corporation was dissolved, the debts due to and by it became extinguished. (*Edmonds* v. *Brown & Tillard*, 1 Lev. 237; Co. Litt. 13, b.; 1 Black. Com. 484; Kyd on Cor. 516.) Its personal property afterwards could only be held by right of occupancy. The act of N. J., appointing trustees, was an *ex post facto* law, as the act of incorporation had already provided that in case of a dissolution of the corporation, its officers should be the

[*107]

trustees. (Pow. Con. 445; *Winnington* v. *Briscoe*, 8 Mod. R. 51.)

THE CHANCELLOR:—If the act repealing the charter of the bank was unconstitutional, the defendants acquired no rights under that act, and the notes in controversy still belong to the corporation. It is proper, therefore, that that question should be first considered. It is a well settled principle of the common law, that the privileges and franchises granted to a private corporation become a right vested, which cannot be divested or altered, except by the consent of the corporation, by a forfeiture declared by the proper tribunal, or by act of parliament. In this country they can only be divested by one of the two first methods. Although the state legislatures have all the powers of the British parliament, where they are not positively restricted by the United States or state constitutions, the fundamental law of our free government has deprived them of the power of interfering with vested rights. In the case of *The Dartmouth College* v. *Woodward*, (4 Wheat. Rep. 518,) the Supreme Court of the United States decided, that the privileges and franchises granted to a private corporation became a contract executed, within the prohibitory clause of the constitution of the United States, which declares that no state shall pass any law impairing the obligation of contracts; and that a law altering the charter, in a material respect, is unconstitutional *and void. Neither that case, nor *The Bank of Columbia* v. *Oakley*, (4 Wheat. Rep. 235,) recognize the distinction contended for by the complainant's counsel, between the franchises, and the administrative part of the charter. On the contrary, in the former case Judge Story says, " Unless a power be reserved for that purpose, the crown cannot, by virtue of its prerogative, without the consent of the corporation, alter or amend the charter, or divest the corporation of any of its franchises, or add to or diminish the number of the trustees, or remove any of the members, or change or control the administration of the

[*108]

charity, or compel the corporation to receive a new charter. This is the uniform language of the authorities, and forms one of the most stubborn and well settled doctrines of the common law." The decision of the court in *The Bank of Columbia* v. *Oakley*, was only an assertion of the equally well settled principle of constitutional law, that a state may pass a law materially altering the remedy of one of the parties to a contract, although it cannot pass a law impairing the obligation thereof, or changing the effect or nature of the contract, in the most unimportant particular.[1] (*Wilson* v. *Mason*, 1 Cranch's Rep. 44. *Fletcher* v. *Peck*, 6 Cranch, 87. *State of New Jersey* v. *Wilson*, 7 Cranch, 164. *Sturges* v. *Crowninshield*, 4 Wheat. 122. *Green* v. *Biddle*, 8 Wheat. 1.)

The validity of the act repealing the charter, must, therefore, depend upon the effect that is to be given to the seventeenth section of the original act of incorporation. This section, in terms, gives the legislature a right, at any time, to alter, amend or repeal the act of incorporation. But the counsel for the complainant contends that this section is repugnant to the grant of the franchises contained in the other parts of the act, and is therefore void. The common law principle, that a condition repugnant to the grant is void, has no application to this case. The seventeenth section is not a condition repugnant to the grant; it is only a limitation of the grant. Even in a common law conveyance, a power of revocation reserved to the grantor was valid. It is true, that by the statute of frauds, (1 Rev. Laws, 77, sec. 5,) all grants of land, with a power of revocation, are declared to be void as against *purchasers who purchase of the grantee before the power of revocation is executed. The object of this statute was to prevent the frauds which were practiced under such powers, at the common law; but even since this statute, the estate will be di vested if the power of revocation is executed while the title

[*109]

[1] 2 Kent, 306, n.

remains in the grantee. If the rule of the common law were otherwise, it could not affect this case. The legislature of New Jersey were competent to alter any rule of the common law. They might, by law, declare that a power of revocation reserved to the grantor in a deed of feoffment should be valid, and that the executing the power should divest the estate granted; or that a general restriction against alienation should be good in a conveyance in fee. And if they could authorize other persons to insert such conditions in their contracts and grants, surely the legislature could annex such a power of revocation to their own grant. The reservation of such a power in a legislative grant, if it was contrary to the common law, would of itself change the law in relation to that particular grant; and the statute law of the grant itself would form the law of that case. It is not pretended that there is anything in the constitution of New Jersey, or of the United States, which prohibits the reservation of such a power in a legislative grant; on the contrary, the insolvent laws of the states have been sustained, on the principle that a general law of the state where the contract was made, and which was in force at the making of such contract, is to be taken as a part of the contract. (*Blanchard* v. *Russell*, 13 Mass. Rep. 16. *Mather* v. *Bush*, 16 John. Rep. 233. *Hicks* v. *Hotchkiss*, 7 John. Ch. Rep. 297. *Ogden* v. *Sanders*, 12 Wheat. Rep. 213.) And I apprehend there never would have been any doubt as to the validity of insolvent discharges, if the provisions of the insolvent laws have been actually incorporated into the contracts, as forming a part thereof. The power of repealing the bank charter was therefore legally and constitutionally reserved to the legislature of New Jersey, and this court will not presume it has been improperly or unconscientiously exercised.

If it were necessary for the defendants to show that the legislature had good cause for repealing the charter, I think *there is sufficient in the bill and answer in this case,

[*110]

to show it was not only the right, but the duty of the legislature to put an end to the banking powers of this corporation as soon as possible.

By the act of incorporation the capital stock of the bank was to be $400,000, divided into 4,000 shares of $100 each; and if any excess was subscribed, the commissioners were to apportion it among the several subscribers. But the corporation were authorized to commence operations when $200,000 was subscribed and paid in. It does not appear, from the bill and answer, how much was subscribed, or whether there was any excess over the 4,000 shares. But it does appear, that of the 217 persons who were subscribers, 187 got no stock; and the commissioners, instead of dividing the 4,000 shares among the subscribers, as directed by the act, limited the number of shares to 2,000, which they were not authorized to do by the act of incorporation. Of that 2,000 the complainant took 800, and the other five commissioners 200 each, and they distribu ted the remaining 200 among 24 other persons. Having thus secured the stock, the complainant and four of his associate commissioners elected themselves directors, in conjunction with four other persons, and appointed the complainant president. The directors gave him $30,000 for his secret services in procuring the charter. With this he was enabled to pay for 300 shares of his stock, which he afterwards pledged to the commissioners of the school fund to secure his bond for the bonus, which he substituted in lieu of the money received from the bank for that purpose. He alleges in his bill, that he bought in 644 shares of the stock subscribed by other persons; for which, and the remaining 500 shares of his original subscription, he gave his notes to the bank without security, for $114,400, and pledged the stock for the payment. By these operations, if all the residue of the stock subscribed was paid in, the capital could not exceed $30,600. If, as was most probably the case, the other directors got discounts in the same proportion, there was not only an entire want of capi-

tal, but the institution was insolvent to the extent of $25,000 when it commenced operations. And as might well have *been anticipated, by those who knew the situation of the institution, the country was flooded with bills of no value, and the bank stopped payment in less than six months after it went into operation. The legislature, under such circumstances, would have done injustice to the community if it had not immediately put a stop to this abuse of the privileges granted by the act of incorporation.

What then was the effect of this repeal, upon the debts, credits and property of this corporation? The effect, at common law, of the dissolution of a corporation, it is not necessary to consider in this case, because the common law is changed by the statute of New Jersey passed in January, 1817, which was read by the complainant's counsel on the argument. That statute provides, that on the dissolution of a corporation of this description, the directors then in office shall be trustees for the stockholders and creditors; and all the property and rights of the corporation are transferred to such trustees. Such would have been the effect of a simple repeal of the charter of this bank. But the same power which had a right to change the common law, had also a perfect right to change the trustees provided for by the act of 1817. This was done in the repealing act. There never was an instant of time when the creditors of the bank were released from the obligation of their contracts, or when any rights vested in the directors as trustees.

The defendants in this case have all the rights which were vested in the corporation at the moment of its dissolution; and the complainant can make any defence to an action brought against him by the trustees which he might have made against a suit brought by the corporation, had it continued in existence. They have, therefore, no right to recover against him as the drawer of the bill of exchange on Thomas B. Woodward, or as indorser of the notes of Daniel Mallery, or Abraham Collins & Co.; in

the drawing and indorsing of which he was acting only as an officer of the corporation. If he has destroyed the collateral security which was taken for the Mallery note, the remedy against him cannot be by action on the note, as indorser. Whether the notes for $114,400 were given in pursuance of a direct *agreement between McLaren and his co-directors, in payment of his stock, as stated in the bill, or by way of discounts, to enable him to withdraw from the bank the capital paid in, as alleged in the answer, cannot materially vary the rights of the parties. The one would be a direct, and the other an indirect fraud upon the act of incorporation and upon the other stockholders of the bank, as well as upon those who might become creditors of the institution under the belief that the $200,000 capital required to be paid in before the bank commenced operations had actually been paid. Whatever shift or device was resorted to for the purpose of evading the provisions of the act of incorporation, a court of chancery will never permit it to be set up to defeat a recovery on those notes for the benefit of the creditors of the bank, who are entitled to be first paid out of the trust property. In either state of facts, the consideration for these notes has not failed. If there is any surplus after paying the debts of the bank, the complainant as a stockholder will be entitled to his share thereof, under the provisions of the repealing act and the act supplementary thereto. That surplus cannot be ascertained until the whole of the debts and property of the bank are collected and turned into money, and deposited in the Court of Chancery of New Jersey for distribution. It follows, from what has been said, that the complainant, so far as respects these stock notes, cannot be entitled to the only relief which is asked for in his bill. In relation to his set-off, there can be no doubt of his equitable right to be allowed for any demand which he had against the bank at the time of the repeal of its charter. If he has purchased up bills of the bank, or procured the assignment of other claims, since that time,

he cannot avail himself of them as a set-off; but must come in for his distributive share with the rest of the creditors.

In consequence of the difficulties in relation to a set-off at law, since the decision of the Supreme Court in *Wheeler* v. *Raymond*, (5 Cowen's Rep. 231,) it is probable the complainant, on a bill properly framed for that purpose, might have been entitled to the aid of this court in allowing his set-off against the notes, on account of the doubt and difficulties *of such a defence at law. When he sought the aid of a court of chancery for this purpose, he should have stated more particularly the nature and amount of those claims for set-off, and the particular circumstances under which they accrued. He should also have framed the prayer of his bill in such a manner that the court would be enabled to direct an account of the debt and credit to be ascertained here, and to decree a payment of the balance which was justly due. As the bill now stands, the defendants are entitled to a dissolution of the injunction, except so much thereof as restrains them from proceeding against the complainant as drawer and indorser of the bills and notes which were drawn and indorsed by him as an officer of the corporation.

[*113]

But as the complainant has asked leave to amend the prayer of his bill, I shall endeavor to modify the injunction in such a manner as to do justice between the parties, and shall permit the complainant to amend his bill, if he thinks proper to avail himself of such permission.

It is very doubtful whether the bill, as it now stands, is anything more than a bill of discovery. To such a bill, the answer of the defendants would necessarily be different from the answer to a bill of discovery and relief. In the latter case, many matters of defence might properly be set up, which would be unnecessary and impertinent in an answer to a bill of discovery merely. If the complainant avails himself of the permission to amend, it must be on

1828.

Patterson
v.
Corporation of
N. York.

payment of the costs of the former answer and of the subsequent proceedings thereon.

If the complainant prefers to have his account with the trustees settled under the direction of this court, as he has not disclosed the items or amount of the set-off which he claims, he must pay into court the amount of the stock notes with interest, to abide the further order and decree of the court, and the injunction will then be retained. But if he prefers to avail himself of a defence at law, I can only require of the defendants, as a condition of the dissolution of the injunction, that they stipulate to allow him to give in evidence any equitable set-off which he had against the demands of the bank at the time of the dissolution of the incorporation.

