.Oneida Special Term, March, 1850.   *Gridley,* J.

Daniel Hascall and Medad Rogers *vs.* The Madison University, and The Baptist Education Society of the State of New-York.

Where a defendant moves to dissolve an injunction, upon the answer and the affidavits attached thereto, the plaintiff may oppose the motion by affidavits other than those attached to the complaint, on which the injunction was granted.

Where, by an act of the legislature the trustees of the Madison University were authorized to change the location of the institution from Hamilton to Syracuse, Rochester or Utica, provided they should, within one year, file with the secretary of state a resolution of the board, electing to make such change and determining at which of said places the University should be located; *Held* that the condition of the act was not complied with, by a resolution to remove the University to Rochester *or its vicinity.*

And the board of trustees having also resolved that such removal of the University to Rochester should be conditioned that legal difficulties interposed should be found insufficient; that B., H. and K. should be a committee to examine such difficulties, and hear arguments; that upon their favorable report the removal should be unconditional; and that whenever such satisfactory report should be received, and the removal made unconditional, the officers of the board should be authorized to file in the office of the secretary of state the resolution fixing the place of location, required by the statute; *Held* that until the committee met together and examined the legal difficulties, and heard arguments concerning them, and made a favorable report thereon, the officers of the board had no power to file the resolution for removal; and that the act of filing the same, without such action having been had by the committee, or such report having been made, was unauthorized and void.

Persons who contribute to a fund on condition that a Literary and Theological Seminary shall be located *permanently* in a specified place, and in consideration thereof, and which is accordingly located there permanently, have a right

Hascall *v.* The Madison University, &c.

to apply to the supreme court for an injunction to prevent an illegal and unau-
thorized removal of the seminary, to another place.

Persons having a right to prevent the removal of the Literary and Theological
Seminary from Hamilton, on the ground of their interest in the same as origi-
nal founders, have also a right to restrain the removal of the Madison Uni-
· versity.

THIS was a motion to dissolve or modify an injunction. The
complaint was filed by the plaintiffs, two of the original found-
ers of the Literary and Theological Seminary at Hamilton, to
restrain the defendants from removing the Madison University
and the Theological Seminary from Hamilton. The complaint
was very long, setting out all the grounds of equity at great
length, and with great minuteness. The opinion of the court,
however, states the facts sufficiently, for the purposes of this
motion. The injunction prohibited the Madison University from
removing its site from Hamilton, and from using the funds of
the Baptist Education Society otherwise than in pursuance of
the contract between the two corporations set out in the com-
plaint. It also prohibited the Education Society from removing
its Literary and Theological Seminary from Hamilton, and from
using its funds otherwise than in accordance with the provisions
of the said contract. The Education Society did not answer.
The Madison University put in an answer, and then moved to
dissolve the injunction. The motion was opposed, on the com-
plaint, and on affidavits.

*H. Harris* and *S. Stevens*, for the motion.

*T. Jenkins* and *C. P. Kirkland*, opposed.

GRIDLEY, J. This is an application to " vacate or modify" an
injunction, granted by the Hon. W. F. Allen, one of the justi-
ces of this court, and is founded, as the notice states, upon
the complaint, and the answer of the Madison University.
Upon this notice, the plaintiff's counsel insist, 1st. That the
motion must be denied, for the reason that an answer, unless
verified by an affidavit, can not be made the foundation of a

motion to dissolve an injunction.    That position is undoubtedly correct; but I think it would be too narrow a construction of this notice, to hold that by the term *answer*, the affidavits by which it was verified, were not intended to be included.    The answer *and the affidavits attached,* were served *with* the notice, and upon *all* those papers the application must be deemed to be made.    2d.  The counsel insist that if the motion is considered as made on the answer *and the affidavits,* they have a right to read affidavits in opposition, other than those attached to the complaint, on which the injunction was granted.    The determination of this question must depend on the construction of certain provisions of the code of procedure.

By the last clause of the 225th section of that instrument it is declared that " the application may be made on the complaint and the affidavits on which the injunction was granted ; or upon affidavits on the part of the defendant, *with* or *without* the answer."    It is provided by section 226, that " If the application be made upon *affidavits* on the part of the defendant, but not otherwise, the plaintiff may oppose the same by affidavits or other proofs, in addition to those on which the injunction was granted."    It is argued by the counsel for the defendants that the legislature merely intended by the foregoing provisions to enact the old rule which regulated the practice in the court of chancery on motions of this character.    (*See* 1 *Hoff. Pr.* 360, 1 ; 1 *John. Ch.* 411 ;  2 *Id.* 202 ;  4 *Id.* 26, 173, 497 ; 1 *Paige,* 100 ;  4 *Id.* 111.)    It will be borne in mind that by the old practice an answer duly verified was *evidence in the cause*—and when responsive, would prevail over the allegations in the bill, unless contradicted by testimony equivalent to that of two witnesses.    Under the present practice, the answer *as such,* is not evidence at all.    The injunction is granted only on the *affidavit* of the plaintiff or some person in his behalf.    (§ 220.)    For this reason there is no provision in the code for moving to dissolve an injunction on the answer alone.    The language of the enactment is not, " on the answer *with* or *without* affidavits;" but " on affidavits of the defendant *with* or *without* the answer." Unless, therefore, the defendant moves solely " on the complaint

and the affidavits on which the injunction was founded," he *must* move on affidavits. It is true, that he may add the answer to the affidavits, and so far as the answer is *positively verified*, it takes the place of an affidavit. Unless it has been duly verified, however, it can not be made the ground of a motion, and then only in the character of an affidavit. If I am right in the conclusion at which I have arrived on this point, then the affidavits offered by the plaintiffs are admissible by the very terms of the 226th section of the code.

The case of *Florence* v. *Bates*, recently decided by Justice Mason, of the superior court, and reported in the January number of the Legal Observer,(*a*) to which I have been referred by the counsel, contains no principle in conflict with these views. The affidavits in reply are therefore admissible on this motion.

The injunction granted in this cause was two fold; prohibiting the Madison University from removing its site from Hamilton, and from using the funds of the Baptist Education Society, otherwise than in pursuance of the contract between the two corporations set out in the complaint; and also prohibiting the Baptist Education Society from removing its Literary and Theological Seminary from Hamilton, and from using its funds otherwise than in accordance with the provisions of the aforesaid contract. No motion is made on behalf of the Baptist Education Society, nor is any question made on this application concerning the right of the plaintiffs to insist upon the continuance of the Theological Seminary at Hamilton. The only point, therefore, to be considered is the right of the Madison University to remove its site to Rochester.

By the first section of the act of April 3, 1848, (*Laws of 1848, p.* 279,) the trustees of the Madison University were authorized to change the location of the Institution from Hamilton to Syracuse, Rochester, or Utica, provided "they should, within one year from the passage of the act, file with the secretary of state, a resolution of the board, adopted by a majority of all the members constituting said board, electing to make such change,

*a*) 8 *N. Y. Legal Obs.* 13.

and determining at which of said places said University should be located."

The plaintiffs alledge in their complaint, that the condition upon which the right to remove the University was thus made to depend, was never performed. And in proof of this allegation, they further state, that on the night of the 14th of August, 1848, the University Board passed two resolutions in the following words:

"Resolved, (The Board of the Education Society concurring,) That it is expedient to remove the Madison University to the city of Rochester, *or its vicinity.* The said removal to be conditioned that legal difficulties interposed be found insufficient; and that Seneca B. Burchard, Ira Harris, and Robert Kelly, be a committee to examine such difficulties, and hear arguments. Upon their favorable report such removal to be unconditional.

"Resolved, That whenever such satisfactory report shall be received, and the removal made unconditional, the officers of the board be authorized to file, according to the provisions of the statute, the following resolution in the office of the secretary of state: 'Resolved, that the Madison University do hereby elect, pursuant to the authority given them, to remove to the city of Rochester, *or its vicinity.*'"

The plaintiffs also alledge in their complaint, that notwithstanding a paper purporting to be a resolution electing to remove the University to Rochester, omitting the words *or its vicinity,* was filed within the time prescribed by the act, in the office of the secretary of state, yet that no such resolution was actually passed by the board. They also further alledge that the members of the committee, appointed in and by the first of the above recited resolutions, never met together to consult upon the subject committed to them; never examined the same; never heard any arguments thereon, and never made any report pursuant to the requirement of the resolutions. In confirmation of these statements, the complaint proceeds to alledge that Robert Kelly, one of the members of the committee, wrote to Mr. Harris or Mr. Burchard, the other members of the committee, giving

Hascall *v.* The Madison University, &c.

an explicit direction to file the resolution for removal without taking any measures to ascertain whether there were legal objections to said removal or not; and that said Kelly actually took no measures to ascertain the same. In addition to this it is stated that Mr. Burchard communicated to Mr. Harris an express refusal to consent that the resolution be filed, unless Chancellor Walworth and Judge Bronson, (if he would act,) and if Judge Bronson would not act, then Chancellor Walworth and the Hon. John C. Spencer should give an opinion that there were no legal difficulties in the way of a removal; and that no such opinion was given by those gentlemen.

It now becomes important to inquire how far the answer controverts these specific charges in the complaint; for notwithstanding they may be made on information and belief only, unless they are *specifically controverted* they are, by the 168th section of the code, to be taken as true. The answer sets out the foregoing resolutions as the same are stated in the complaint, except that the words *or its vicinity*, immediately following the word *Rochester*, are omitted; and then *admits* that the resolutions as set out in the answer, were passed by the university board at the time alledged in the complaint. The answer *admits* and *alledges* that the last of the said resolutions was filed on the 25th day of January, 1849, after the officers of the board had received from the said committee a report favorable to the removal of the university. In a subsequent paragraph of the answer, it is denied that the said committee did not report pursuant to the requirement of the said resolutions, and also that the said Burchard did not concur in the report. This is the sum of what is found in the answer in relation to the specific allegations in the complaint concerning the resolution of removal, and the manner in which the committee appointed by the board performed the duty assigned to them.

It will be perceived that several questions arise upon the above issues presented by the pleadings.

1st. Whether it was competent for the university board to pass a contingent resolution of removal, to take effect and become absolute, upon the decision of a certain important question by a

committee appointed for that purpose.    In other words, whether the board could delegate the power to determine the only question upon which the removal was made to depend, to any other body than themselves.    Whether a resolution, making the removal depend on the opinion of a committee of three as to the existence of legal difficulties in the way of removal; and on the further fact, whether the report of such committee should be satisfactory to the officers of the board—would be valid without a subsequent ratification by the board of the acts of its agents.

2dly.    Whether the resolutions passed on the night of the 14th of August, 1848, were resolutions for a removal of the university to *Rochester*, or in the alternative *to Rochester or its vicinity*. For if the resolution contained the latter clause, most clearly the condition of the act was not complied with.    The vicinity of Rochester may mean a location within a mile beyond the limits of the city, or in any of the neighboring towns.

3dly. Whether the committee ever performed the duty assigned to them in *such a manner* as to confer on the officers of the board the power to file the resolution for removal.    For if they did not, then the act of filing the resolution was unauthorized and void.

I. Upon the first of these questions I have a strong impression; but as the question has not been argued by counsel, and as it may hereafter become material upon the final hearing of the cause, I withhold the expression of any opinion upon it.

II. Upon the second question it is to be borne in mind, that, though the affidavit of Mr. Humphrey is appended to the answer, he does not profess to have any knowledge of the proceedings of the university board in August, 1848, nor of the resolutions passed at that meeting.    The answer is, therefore, as to this point, verified by a single affidavit only.    Now to oppose this allegation in the answer, and to show that the resolution as passed on the night of the 14th of August, 1848, did provide for the removal to Rochester OR ITS VICINITY, the plaintiffs rely— (1st.) On the affidavit of Professor Eaton.    This gentleman swears that he was present when the resolutions in question

were passed by the university board, late in the night of the 14th of August, 1848, and heard the same read aloud before the board; and he testifies *positively* that they *did contain the words* "*or its vicinity*," immediately following the phrase "*city of Roches-ter*." He also explains the reason why the resolutions were made to take the form of this alternative. According to his statement, an objection was raised in the course of the discussion, that the city was an unsuitable location for the institution; whereupon it was replied that the location need not be confined to the city, but might be established at any place in its vicinity; and the resolutions were drawn to conform to this suggestion. (2.) On the affidavit of Professor Spear, who was present during all the discussions upon the resolutions, and at the time when the same were passed; and this witness also positively states that the resolutions, as they were passed, contained the alternative of a removal *to the city of Rochester or its vicinity.* (3.) On a copy of the original resolutions, as they passed the university board, under the hand of the Rev. John H. Raymond, communicated officially by said Raymond, as secretary of the university board, to the Rev. Z. Freeman, assistant corresponding secretary of the Baptist Education Society. These resolutions are proved by Professor Spear to be in the proper hand-writing of the secretary of the university board. They bear date on the 14th of August, 1848, and contain the all-important words, TO THE CITY OF ROCHESTER OR ITS VICINITY. Now, what explanation the Madison University may be able, hereafter, to give of this transaction, and what may be the balance of evidence upon this point, on the hearing of the cause, when all the testimony shall have been taken, I will not undertake to say; but it is quite clear upon the papers before me on this motion, the answer is completely overthrown. We are brought to the inevitable conclusion (in the absence of all explanation,) that the resolution has been shorn of the fatal words since it was passed by the board.

III. *Upon the third question,* I am also of the opinion that the weight of evidence is with the plaintiffs. This committee was composed of three members. A most important trust was

committed to them.  The first resolution made the removal to depend on the condition that *legal difficulties interposed should be found insufficient,* and this committee was appointed *to examine said difficulties, and to hear arguments, and to report* their decision as to the existence of these difficulties.  And it was only on a favorable report by this committee, on the existence of these legal difficulties, made to the officers of the board, that the latter were authorized to file the resolution of removal. It was the duty, therefore, *of all the members* of this committee to have *met together, examined these legal difficulties, and heard arguments concerning them.*  They were a tribunal, constituted by the board, to decide, in the place of the board itself, a most material question—one, on the determination of which, the decision of the board on the subject of removal was to depend.  The plain language of the resolution, as well as the rules of law, which declare what shall be necessary to render the execution of a power or trust of this description a valid act, required the members of this committee to meet together, to examine and decide the important question which the board had delegated to their judgment and discretion.

The question now arises whether these requisites to a valid execution of the power conferred by the resolution were ever complied with.  The complaint charges that the committee never met together for consultation ; and the answer leaves that particular charge unanswered.  The answer is also equally silent as to the fact of their hearing arguments and examining the question submitted for their decision.  The answer does indeed aver that the officers of the board received a report favorable to the removal of the university.  But it does not state whether *one* member signed the report in behalf of *all,* or whether it was signed by *each* member of the committee for himself— nor whether the report found that no legal difficulties in the way of removal existed ; or whether it was (in the words of the answer) merely *favorable to the removal of the university*—nor whether Mr. Burchard concurred in the report, and assented to the filing of the same *before* or *after* the report was filed.  Nor does it contain one word in reply to the specific charges in the

complaint concerning the refusal and absolute omission of Kelly to inquire concerning the existence of legal difficulties, nor concerning Burchard's refusal to consent to filing the resolutions till Messrs. Walworth and Spencer should have expressed an opinion that no legal difficulties existed. I have suggested these omissions of the answer, and the want of particularity in its statements, in no hypercritical or censorious spirit; but merely to introduce and show the application of the evidence furnished on these topics by the opposing affidavits. Mr. Burchard was one of the members of this committee, and it was he who made the affidavit verifying the answer. Perhaps the omissions I have adverted to, may be accounted for, when it is stated that Messrs. Eldridge and Babcock both swear in their opposing affidavits to sundry conversations with Mr. Burchard, in which he stated that the members of the committee never met together for consultation—that he went to Albany for the purpose of attending such meeting, and saw Mr. Harris; but that Mr. Kelly was not there—that he was informed by Mr. Harris that he had received a letter from the said Kelly, declaring that he could not attend the meeting but that he was *in favor of filing the resolution, whether legal difficulties existed or not.* Whereupon he, the said Burchard, stated to Mr. Harris that he, as one member of the committee, would never consent to the filing of the resolution, unless an opinion was first obtained from Chancellor Walworth, and Judge Bronson, if he would consent to give an opinion, and if not, then from Chancellor Walworth and the Hon. John C. Spencer, that there were no legal impediments to the removal of the institution.

Now, again—I desire to say that I will not allow myself to speculate upon what may be the character and complexion of the proof at the hearing; I cannot, however, upon the papers before me, resist the conclusion that the committee did not so discharge the trust delegated to them as to authorize the filing of the resolution of removal—even admitting that a trust of this kind were capable of being delegated at all. If I should dissolve this injunction, and the university, with the professors and funds of the Education Society, should be removed to the city

of Rochester—and on the hearing of the cause, it should be found and determined that the right to remove did not exist by law—then a great misfortune would have fallen upon both institutions; and a mischief would have been produced, which, in the language of the authorities, would be irreparable. I must therefore hold that the condition on which a removal of the university was authorized by the act of 1848, was not complied with; and therefore that such removal would be sanctioned by no legal right or authority.

The only remaining question to be decided is, whether, conceding the removal of the university to be an illegal and a wrongful act, the *plaintiffs stand in a situation* to invoke the aid of this court to prevent it. A proper disposition of this question will involve the consideration of several others.

1st. Whether they have a right to restrain the removal of the Theological Seminary. Looking then into the allegations in the complaint which are not denied, and which, for the purpose of this motion must be taken as admitted, we find the following statement of facts: That after the incorporation of the Baptist Education Society, in the year 1819, a committee was raised by the board to select a site for the seminary which was to be erected to carry out the objects of the society. That previous to the determination of this question, numerous subscription papers were circulated, and large sums were subscribed, in the aggregate amounting to several thousand dollars, *on the condition,* as expressed on the face of the papers, "that the Baptist Education Society should locate *permanently* a Literary and Theological Seminary in the village of Hamilton;" and that the plaintiffs were original subscribers to a considerable amount upon the like condition—that the committee, influenced by these subscriptions, made a report favorable to the selection of Hamilton as the site of the seminary. Whereupon, the Education Board, after receiving the report of the committee, *decided to locate their seminary in the village of Hamilton,* PERMANENTLY, on the condition that six thousand dollars should be paid to the institution in the manner particularly stated in the resolution. That, afterwards, six gentlemen, of whom the plaintiff Hascall

was one, executed to the society a covenant by which they agreed, in consideration of the *permanent location* of the seminary at Hamilton, and of an assignment of the subscriptions aforesaid, to furnish the society, in buildings, and board of pupils, what was deemed equivalent to $6000. This covenant was accepted by the society, and was afterwards performed, (with some changes in the matter of buildings, agreed to by the society) by the payment of the full sum of $6000, and thirty-two dollars and seventy-two cents over.

This sum was accepted by the society in full satisfaction of the covenant aforesaid, and in that manner the location of the seminary was made *permanently at Hamilton*, so far as the solemn agreement of the contracting parties, and the payment of a large consideration, by the covenantors, on the faith of such agreement, could make it so. What, then, is the true interpretation of the word "*permanent*," as used by the contracting parties in this agreement? Does it mean that the seminary was to be located at Hamilton while the trustees chose to keep it there, and no longer? Did the contracting parties contemplate that the board would have the power and right to remove the institution in one year, or in ten years, if they should see fit? If this be the true construction of the agreement, then the word "*permanent*" is without significancy, and adds nothing to the meaning of the sentence; for if the contributors of the $6000 had merely stipulated for the *location* of the institution at Hamilton, Hamilton would have continued to be the location, in the contemplation of all parties, until some good reason should arise, sufficient, in the judgment of the trustees, to justify a removal. The parties therefore meant something more than this. I acknowledge that the word "*permanent*" does not always embrace the idea of *absolute perpetuity;* as when an individual is said to have selected a particular place as his permanent, in opposition to a temporary residence. But when the citizens of a certain locality give large sums of money, on condition that an institution of learning shall be *permanently* located there, the word has a different meaning. When such a stipulation is incorporated into an agreement, it means that the place agreed

on shall be the site of the institution as long as the institution endures. Those who part with their funds on the faith of such an agreement, look to the enduring benefits to be derived from such an institution, by themselves, their successors, and the citizens of the entire locality, while the institution shall continue to dispense its varied blessings. And when they have secured the permanent enjoyment of these advantages by a solemn covenant, they have a right to invoke the aid of this court, to compel a faithful performance of such contract by the trustees of the corporation, and to protect themselves against the consequences of a violation of the trust, by a removal of the institution, or a perversion of its funds in such a manner as to defeat the fair intent of the parties to the agreement.

2dly. Conceding that the plaintiffs have a right to prevent the removal of the *Theological Seminary,* I think they have also the right to restrain the removal of the *university.* I do not rest this opinion on the ground, that by the provisions of the charter of the university alone, that corporation became consolidated with, or the necessary adjunct of the Baptist Education Society. I intend to express no opinion on that point. Upon the facts stated in the complaint, however, no one can doubt that such was the intention of those who procured the passage of the act of incorporation. However this may be, there is no doubt that the legislature contemplated a practical union by contract, of the two corporations, to promote the joint objects of both. By the 9th section of the act, (*Laws of* 1846, *p.* 33,) "the Education Society was authorized to make such arrangement with the university for the transfer of the property of the society, or any part thereof, either absolutely or conditionally, to the university, as the society should deem proper." Such an arrangement was made, by which the use of the property of the society was transferred to the university, and mutual stipulations were entered into for the promotion of the objects of both corporations. It can not be pretended that this contract can be performed, while the university is at Rochester and the Theological Seminary at Hamilton. The entire scope of the agreement, with its various subordinate provisions, contemplated

a practical union in the enterprise of conducting the business of the two institutions, at Hamilton.   To accomplish this purpose, the Education Society granted to the university the use of its college edifices, its library, philosophical apparatus and its other personal property and funds, without the power  to reclaim  any part of this property until two years after a notice given, with the reasons assigned for the rescinding of the contract.   In consideration of this grant, the university undertook to sustain the whole expense of instruction in both the literary and theological departments, under the charge of *one faculty*.   It seems to me that while this contract subsists, no statute could unite the two institutions in closer bonds than this agreement, to which the trustees of the respective corporations were parties.

But it is said that so far as this contract bound the university to Hamilton, it has been released by the education board.   Passing over the objection made to the regularity of this proceeding, it is sufficient to say, that that resolution was passed in contemplation of a regular and legal removal of the university, on a performance of the conditions prescribed by the act by which the right to remove was given.   The language of the resolution shows this to be so ; and the release was only to take effect *" when the university should be prepared to quit Hamilton."* This expression obviously means, when the university should be prepared to remove, under the provisions of the act which conferred the right of removal; and not when it had forfeited and lost that right, and was prepared to remove in defiance of law.   This construction is placed beyond the shadow of a doubt when we advert to the first resolution of the university board. That resolution, by express terms, was made dependent on the concurrence of the board of the Education Society ; and the resolution of the latter board consenting to the removal, was the act of concurrence contemplated by the university board.   But the resolutions of the university board look *only* to a removal in pursuance of, and in compliance with, the provisions of the act. The consent of the education board, therefore, was only given, as both parties understood it, to a legal removal under the act, and not otherwise.

Hascall *v.* The Hamilton University, &c.

Again, this resolution was passed in contemplation of the removal of the Theological Seminary to Rochester also, and was followed afterward by a resolution to that effect. In addition to this, by a careful reading of the resolution, it appears that no part of the contract was abrogated, but that which confined the university to Hamilton. It was understood by both parties that the contract was yet to be carried out, with this exception—that the place of performance was to be Rochester, and not Hamilton. The license to the university to leave Hamilton, if not originally void, has become so by the present incapacity of that institution to change its location under the law, and by the total failure of the consideration on which it was granted. The removal of the university has become incompatible with the fulfilment of the contract, which still subsists in full force. Although such removal would not involve the removal of the Theological Seminary from Hamilton, it would leave that institution destitute of all power to carry on its educational operations. The university has a valid grant of its property, irreclaimable except upon two years' notice. The removal of the university, funds and faculty, would be as fatal to the interests of the seminary at Hamilton, as if the institution were itself removed, or its charter repealed. For this reason the plaintiffs, (especially Hascall,) who have a right to prevent the removal of the Literary and Theological Seminary from Hamilton, have the same right to prevent the removal of the university ; inasmuch as during the continuance of the contract of union, the removal of the latter would render the former institution incapable of keeping up its establishment, and accomplishing the objects for which it was founded. Upon this ground, I am of the opinion that Hascall has the right to restrain the trustees of both corporations from the prosecution of an enterprise, that, if carried out, would be fatal to the interests of the seminary at Hamilton.

Having come to this conclusion, I desire, for the purpose of preventing any misconstruction, to say, that I by no means intend to impute a design to any of the parties to commit a wrongful or injurious act. They have, doubtless, acted in entire good faith. I speak only of the legal character of certain acts which

have become wrongful, because not warranted by law. I will also add that my views and reasonings are based solely on the state of facts which is presented by the pleadings and affidavits read on this motion. It is possible that the proofs, when taken, may present a very different case. But upon these papers the motion must be denied, and upon grounds that seem to me unanswerable, until a different state of facts shall be made to appear.

Motion denied.

ALBANY SPECIAL TERM, March, 1850.  *Hand,* Justice.