THE PEOPLE OF THE STATE OF CALIFORNIA, RESPONDENTS, *v.* THE PRESIDENT AND TRUSTEES OF THE COLLEGE OF CALIFORNIA, APPELLANTS.

POWER OF CORPORATIONS OVER CORPORATE PROPERTY.—All corporations capable of taking and holding property have the *jus disponendi* as fully as natural persons, except so far as they are restrained by statute.

IDEM.—Under this general power, a corporation may dispose of the whole of its property for any lawful purpose. The case of *Miners' Ditch Co.* v. *Zellerbach*, (37 Cal. 543), cited and approved.

DISINCORPORATION.—There is no statutory provision for the dissolution of corporations for literary purposes having no stockholders.

IDEM.—In the absence of any statutory provision defining the mode, a corporation aggregate may dissolve itself by the surrender of its franchise, by proper proceedings for that purpose.

PROPERTY OF CORPORATION ON ITS DISSOLUTION.—On the dissolution of a corporation for literary purposes, by a surrender of its franchise, owing no debts, all its personal estate, and all its real property, acquired by purchase for value, vests, by operation of law, in the State.

POWER OF THE PRESIDENT AND TRUSTEES OF THE COLLEGE OF CALIFORNIA.— It was for the President and Trustees of the College of California to decide whether the public interest would be subserved by dissolving the corporation and devoting its property, after the payment of its debts, to the support of the State University.

APPEAL from the District Court of the Fourth District, City and County of San Francisco.

This case was submitted to the Court upon an agreed statement, the following extract from which fully exhibits the origin and nature of the controversy :

In the year 1855 the College of California was incorporated as a College of Science and Letters, pursuant to the pro-

visions of an Act of the Legislature of the State of California, entitled "An Act to provide for the Incorporation of Colleges," passed April 20, 1850, and the several Acts amendatory thereof.

The Trustees of said College received, from time to time, general donations of money from individuals, for the benefit of the College; and also acquired, by gift and purchase, various parcels of land, among which was the one hundred and fifty acre tract selected as the site for the College, which is the subject of this suit.

The Trustees of the College were desirous to create and carry on a University, but finding themselves unable, for want of sufficient pecuniary resources, to do so on the scale required by the educational necessities of the State, and being desirous of inducing the State of California to appropriate from the public funds sufficient money to endow a University which should satisfy the wants of the community, they, on the 7th October, 1867, passed the following resolutions, viz:

"Resolved, That the President and Board of Trustees of the College of California hereby offer to donate and convey to the State Board of Directors of the Agricultural, Mining and Mechanical Arts College, one hundred and sixty acres of land, in the Township of Oakland, Alameda County, including the lands between the two ravines, commonly known as the California College site, for the site and farm of the said State College.

"Resolved, That in making this donation, the College of California is influenced by the earnest hope and confident expectation that the State of California will forthwith organize and put into operation, upon this site, a University of California, which shall include a College of Mines, a College of Civil Engineering, a College of Mechanics and a College of Agriculture, and an Academical College, all of the same grade, and with courses of instruction equal to those of Eastern Colleges.

"Resolved, That the President and Secretary of this Board be authorized to enter into a contract with the State Board of Directors of the Agricultural, Mining and Mechanical Arts College, to the effect, that whenever a University of California shall be established, as contemplated in the next preced-

ing resolution, then the College of California will disincorporate, and, after discharging all its debts, pay over its net assets to such University."

The proposition embodied in the foregoing resolutions was accepted, and the President and Trustees of the College of California, by deed, conveyed said tract of one hundred and sixty acres directly to the State of California. And, on the 23d March, 1868, the Legislature of the State of California passed an Act entitled an Act to create and organize the University of California, to be located upon said tract of one hundred and sixty acres, so conveyed to the State. And, in pursuance of the provisions of said Act, the Board of Directors provided by it for the government of the University, incorporated according to law, and are now a corporation under the name and style of the Regents of the University.

The Regents of the University entered upon and took possession of said tract of one hundred and sixty acres, selected as the site of the University, and have expended thereon large sums of money, viz: eight or nine thousand dollars, in improving said land and preparing it for the grounds and buildings of the University. They have also contracted to purchase from the Trustees of the College an additional tract of forty acres for the University, at a specified price, and they are now in the possession of the said lands for the State, holding them as the site of the University.

The passage of the Act to create and organize the University of California was procured at the instigation of the Trustees of the College of California; and no notice whatever was given to the State, or to the Regents of the University, that any donation whatever had been made to the College until after the contract and expenditures aforesaid.

The College of California still retains about two hundred acres of lands heretofore described, which have been greatly enhanced in value by the location of the University on the one hundred and sixty acres aforesaid. It also holds lands and buildings in the City of Oakland which it uses for educational purposes, and these are also greatly enhanced in value by the same cause, and are rendered fitter for educational purposes by the proximity of the University; and the

value of its property now on hand is at least equal to the whole amount of donations made to it.

But the Trustees of the College question their power to disincorporate, and, after paying debts, to turn over the remaining assets of the College to the University; and this has created a cloud upon the title of the State of California to the said site of the University, or a claim to the same in the College, adverse to the State, which has caused the Regents of the University to suspend the expenditures of any of the funds of the University in improving or building upon the said site, until such adverse claim or cloud is judicially determined, and the legal title of the State be quieted.

And, for the purpose of having the adverse claim of the College to said land determined, and the legal title of the State to the same quieted, the parties hereto agree to the foregoing as a full and correct statement of all the facts upon which the controversy between them depends, and submit the same to this Honorable Court for its decision and decree.

Upon this statement, a judgment was rendered in favor of the plaintiff, in the Court below, and the defendant appealed.

*Jo Hamilton,* Attorney General, and *J. B. Felton,* for Respondents.

*Wilson & Crittenden,* for Appellants.

CROCKETT, J., delivered the opinion of the Court:

This is an action to quiet the title of the State of California to a tract of one hundred and sixty acres of land, situate near the City of Oakland, on which it is proposed to erect the State University; and the only question for our decision on this appeal is, whether or not the conveyance from the President and Trustees of the College of California to the State, under the facts stated in the agreed case, was and is operative in law to vest the title in the State. In other words, whether or not, upon the agreed facts, the President and Trustees of the College had the power in law to convey

the land to the State, under the circumstances and for the purposes disclosed in the record, or whether the transaction was *ultra vires*.

The College was incorporated under the Act of April 20, 1850, entitled "An Act to provide for the incorporation of Colleges," (Stats. 1850, 273), and the Act amendatory thereof, passed April 13, 1855. (Stats. 1855, 110.) In defining the powers of the Trustees, it is provided in Section 7, that they shall have power " to receive and hold by purchase, gift or grant, any real or personal property, provided that the yearly income of the College shall not exceed its necessary yearly expenses ten thousand dollars ;" and "to sell, mortgage, lease and otherwise use and dispose of such property in such manner as they shall deem most conducive to the prosperity of the College." The general Corporation Act provides (Sec. 1) that every corporation, as such, shall have power "to hold, purchase and convey such real and personal estate as the purposes of the corporation shall require, not exceeding the amount limited by law." Under these provisions, it is quite evident the Trustees have an unlimited discretion in respect to the sale or other disposition of the corporate property, for the advancement of the interests of the College ; and it is equally plain that so long as they act in good faith, their discretion, in this respect, is absolute. They alone are to decide whether the proposed disposition of the property will be "most conducive to the prosperity of the College." There is no room for argument on this point. But it is suggested that the action of the President and Trustees of the College of California, in alienating its property, is not only not "conducive to the prosperity of the College," but is avowedly intended to terminate its existence in order that its corporate property may be devoted to the building up of a new institution of learning, with a different name, and under a new management; that the conveyance of the tract in question to the State was in part execution of this general plan ; and that when the State, through its authorized agents and officers, accepted the conveyance, it had notice of the intention and purposes of the Trustees in making it; that whilst the Trustees may make such dispo-

sition of the corporate property as they shall believe will conduce to the prosperity of the College, they have no power to destroy it by alienating its property, with the avowed intention to terminate its existence and turn over its estate to another institution; and that the State, having taken the conveyance with notice of the unlawful purpose for which it was made, is not entitled to the aid of a Court of equity in order that it may thereby validate a transaction which has an incurable infirmity.

In the recent case of *Miners' Ditch Company* v. *Zellerback* (37 Cal. 543), we had occasion to examine with much care the power of a corporation over its corporate property; and we held that all corporations capable of taking and holding property have the *jus disponendi* as fully as natural persons, except in so far as they are restrained by statute; that under this general power, a corporation, unless restrained by statute, may dispose of the whole of its corporate property for any lawful purpose; and that if it conveys its property for a purpose apparently lawful, and within the scope of its powers, to a *bona fide* purchaser without notice, the transaction will be valid as between the corporation and the purchaser, even though the secret purpose of the corporation was unlawful; that if the purchaser had notice of the unlawful purpose, and if the contract was fully executed and the purchaser was let into the possession, the Court would refuse its aid to enable the corporation to recover the property, on the ground that "*in pari delicto, potior est conditio defendentis.*" The first point, therefore, to be ascertained in the case we are considering is, whether the conveyance from the President and Trustees of the College to the State was in part execution or in furtherance of an unlawful plan for the disposition of the corporate property of the College. The agreed case shows that the President and Trustees were actuated by the most laudable motives in the disposition they proposed to make of the property. The *bona fides* of the transaction is not open to suspicion; on the contrary, it appears affirmatively that the President and Trustees were actuated only by a praiseworthy desire to build up an institution of learning commensurate with the wants of the State, and capable of dispensing

greater benefits to the public than could be anticipated from the College of California. If their laudable purpose fails, it will be solely because of a want of the lawful power to accomplish it, and not because it is tainted with any moral wrong. It is a question of power merely, and in that light we shall consider it.

The Act for the incorporation of Colleges provides no method by which they may be disincorporated or dissolved. But the general Corporation Act (Sec. 31) prescribes a mode for dissolving trade corporations on the petition of the stockholders. This provision, however, can have no application to a corporation for literary purposes having no stockholders; and we are not aware of any statutory provision for dissolving a corporation of this character. But at common law both municipal and private corporations may be dissolved by a surrender of their franchises. In Angell and Ames on Corporations (Sec. 772), after announcing that some doubt has existed in England touching the power of a municipal corporation to surrender its corporate existence, the author concludes that "by far the better opinion is, that where the surrender is duly made and accepted, it is effectual to dissolve a municipal body. In this country, the power of a private corporation to dissolve itself by its own assent seems to be assumed by all Judges who touch upon the point." The authorities quoted in support of the last proposition are *Riddle* v. *Proprietors of Locks, etc.* (7 Mass. 185); *Hampshire* v. *Franklin,* (16 Mass. 86); *McLaren* v. *Pennington,* (1 Paige 107); *Enfield Toll Bridge Company* v. *Connecticut Railroad Company* (7 Conn. 45); *Slee* v. *Blum,* (19 John. 456); *Canal Company* v. *Railroad Company* (4 Gill. and J. 1); *Trustees, etc.* v. *Zanesville C. and M. Company* (9 Ohio, 203); *Penobscot Boom Company* v. *Sampson,* (16 Maine, 224); *Mumma* v. *Potomac Company* (8 Peters, 281.)

Chancellor Kent says: "The better opinion would seem to be that a corporation aggregate may surrender, and in that may dissolve itself; but then the surrender must be accepted by Government, and be made by some solemn act to render it complete." (2 Kent's Com. 311.)

When the statute prescribes a particular method for dis-

solving a corporation, that method must of course be pursued; but our conclusion is, that in the absence of any statutory provision defining the mode, a corporation aggregate may surrender its franchise by proper proceedings for that purpose. It is not necessary in this case that we should lay down any precise rule as to the particular method by which the surrender may be accomplished and rendered effectual. For the purposes of this decision, it is sufficient for us to have ascertained that there is a method by which the College of California may surrender its franchise. It was and is for the President and Trustees to decide whether or not the public interest would be subserved by dissolving the corporation and devoting its property, after the payment of its debts, to the support of a new and kindred institution, to be established under more auspicious circumstances, and with a more liberal endowment. There are no stockholders to be consulted whose interests might need protection; and the plan proposed is to take effect only after all the debts of the College are paid. Under these circumstances it would be an extraordinary *casus omissus* in the law if the managers of a literary institution, without a sufficient endowment to render it effective, were compelled, against their convictions and judgments, to maintain it in its feeble, sickly condition, when, by a surrender of its franchise and devoting its property in aid of a new institution of learning, a great public good might be accomplished. We entertain no doubt whatever of the power of the President and Trustees of the College not only to surrender their franchise, but to transfer the corporate property, after the payment of debts, to the State for the use of the University. The end proposed to be accomplished by the President and Trustees was not only lawful and within the scope of their powers, but was eminently meritorious and conducive to the public interest.

The fact that a portion of the funds of the College were the result of voluntary donations to it can, in no degree, impair the power of the Trustees to surrender its franchise and dispose of its property in the manner proposed. The donors must be presumed to have known the law; and must be held to have assented in advance to any lawful exercise of

power in good faith by the President and Trustees in respect to the corporate franchise and property.   In addition to this, the donations were absolute and unconditional.   The donors retained no interest, present or future, in the sums donated, nor acquired thereby any interest whatever in the corporate property, nor any right to control it.   The donations were voluntary offerings by patriotic citizens in aid of the cause of education; and the management and disposition of the fund was confided absolutely to the President and Trustees, subject only to such restrictions and limitations as the law imposed upon them; and, as we have seen, the law does not prohibit them from dissolving the corporation and applying its funds, after payment of debts, towards the endowment of another kindred institution.   That the Trustees have the power to surrender the franchise, after its debts are paid, is a proposition which admits of no doubt; and if they should do so, without having made any disposition of its property, there being no stockholders or creditors, the personal property of the corporation would vest in the State.   (2 Kent Com. 386; Angel and Ames on Corp. Sec. 195.)   Such real estate as remained undisposed of, and which had been acquired by donation, would revert to the donors.   But this rule would not apply to real estate acquired by the corporation by a purchase for value.   In such cases the vendor has no further interest in the property or in its application, and on a dissolution of the corporation, if there be no stockholders or creditors, the title would vest in the State, in the same manner as if it were personal property.   This point was under discussion in *Bacon* v. *Robertson*, (18 How. U. S. R. 480), and in delivering the opinion of the Court, Mr. Justice Campbell says:   "The acquisitions of real property by a trading corporation are commonly made upon a bargain and sale, for a full consideration, and without conditions in the deed; and no conditions are implied in law in reference to such conveyances.   The vendor has no interest in the appropriation of the property to any specific object, nor any reversion, where the succession fails."   We are satisfied this is the true rule.   If the College of California, therefore, had surrendered its franchise, owing no debts, all its personal

estate then remaining, and all its real property acquired by purchase for value, would have vested, by operation of law, in the State. It appears from the agreed statement that the whole of the tract of one hundred and sixty acres in contest was acquired by purchase for a valuable consideration, except the fifteen acres conveyed by Pioche and the ten acres conveyed by Blake; and the latter has expressly ratified the conveyance to the State, while the former has conveyed to the College by deed absolute, and released it from any obligation to appropriate the land to any particular use; which is equivalent to a ratification of the conveyance to the State. The President and Trustees, therefore, in conveying this tract to the State, in anticipation of an actual dissolution of the corporation, have only accomplished in advance a result which would have ensued by operation of law on a dissolution of the corporation, after the payment of its debts. The case shows that it yet retains property amply sufficient to meet the demands of its creditors, none of whom are here to complain of this transaction.

On the whole, we see no error in the record.

Judgment affirmed.

RHODES, J.: I concur in the judgment.

SANDERSON, J., expressed no opinion.